No. 01-813

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 264

BARBARA D. BRYAN,

Petitioner and Appellant,

v.

YELLOWSTONE COUNTY ELEMENTARY
SCHOOL DISTRICT NO. 2 and BOARD OF
TRUSTEES OF YELLOWSTONE COUNTY
ELEMENTARY SCHOOL DISTRICT NO. 2,

Respondents and Respondents.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Peter Michael Meloy (argued), Jennifer S. Hendricks, Meloy Law Firm,
Helena, Montana

For Respondents:

Laurence R. Martin (argued), Mary E. Duncan, Felt, Martin, Frazier, Jacobs
& Rapkoch, P.C., Billings, Montana

For Amicus Curiae:

Justin Starin, Montana School Boards Association, Helena, Montana
(for Montana School Boards Association)

Argued:  May 21, 2002
Submitted:  May 23, 2002
Decided:  November 26, 2002

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1    In anticipation of a projected budget shortfall for the 2001-02 school year, Respondents Yellowstone County Elementary School District No. 2 and Board of Trustees of Yellowstone County Elementary School District No. 2 (collectively referred to hereinafter as the "District") elected to close three elementary schools in Billings, Montana.  Appellant Barbara Bryan filed a petition in the Thirteenth Judicial District Court, Yellowstone County, for a writ of prohibition precluding the District from initiating the school closures and a writ of mandate directing the District to comply with an adopted school closure policy.  Bryan cited violations of her constitutional right to know and participate in support of her petition.  The District Court denied Bryan's petition and Bryan appeals.  We reverse and remand.

¶2    We address the following restated issues on appeal:

¶3    1. Is an advisory committee, established by a school board, subject to the constitutional mandates prescribed in Article II, Section 9 of the Montana Constitution?

¶4    2. Did the District violate Bryan's constitutional right to know and participate?

¶5    3. If the District violated Bryan's constitutional right to know and participate, to what remedy is Bryan entitled?

BACKGROUND

¶6    In the summer of 2000, in anticipation of a budget shortfall for the 2001-02 school year, the District directed a group of principals, referred to as the Principals' Committee, to investigate alternative methods of "delivering education," aside from the traditional K-6 model.  The Principals' Committee sought to reduce operating expenses and maintain student-teacher ratios

2

without necessitating school closures. On February 12, 2001, the Principals' Committee, now referred to as the Reconfiguration Committee, presented a report to the Billings Public School Board. This report introduced three models to reduce expenditures and maintain optimal student-teacher ratios: cluster schools, kindergarten centers, and sister schools.

¶7 Following the submission of this report, the Reconfiguration Committee was expanded to further investigate the viability of the latter two models. This expansion added three teachers, a school librarian, and the Billings Education Association president to the committee. Nilo Cabrera, a member of the School Board, had also joined this committee sometime in early February. From mid February to the first week of March 2001, the Reconfiguration Committee, the School Board, and the public exchanged ideas on implementing the proposed reconfiguration models.

¶8 On March 5, 2001, the School Board established another committee, the Facilities Committee, to review the reconfiguration proposals and consider the option of school closures. The Facilities Committee consisted of the principals from the Principals' Committee, Nilo Cabrera, two teachers, and four members of the public from various geographical areas of town. The Facilities Committee was to gather information and provide a recommendation to the School Board on April 2, 2001.

¶9 The Facilities Committee first convened on March 19, 2001. From that date to April 9, 2001, the Facilities Committee met approximately eight times to synthesize a multitude of information

in support of its ultimate recommendation. Sometime between the 19th and 21st of March 2001, Cabrera, a computer professional by trade, utilized a spreadsheet program to summarize information regarding various schools in the district. The spreadsheet contained, in part, information about each school's: capacity; per capita expenditures for gas, water, and electricity; square footage; maintenance costs; projected cost of repairs; percentage of students bused to school; special education requirements; growth potential; and average class size.

¶10 Based on this and other information, Cabrera developed a rating system which assigned points to each respective school. Purportedly, the schools which received the highest point totals were those which were the least cost-effective for the District to operate. Between March 19 and April 9, 2001, Cabrera distributed several copies of this spreadsheet to the Facilities Committee, the public, and the School Board. However, the copies varied in format and content. For instance, some versions contained the names of the schools, others substituted an objective identification number for the school names. Further, some versions did not incorporate the rating system or explanation of the point allocation.

¶11 On March 29, 2001, the School Board hosted a public forum to address the budget issues confronting the District for the 2001-02 school year. The School Board disseminated budget information to Bryan and the rest of the general public in attendance, which included one version of Cabrera's spreadsheet. This version of the spreadsheet did not reference the rating system or otherwise

4

indicate any prioritizing scheme regarding the schools in the district. Following this meeting, the Facilities Committee completed its deliberations and submitted its recommendation to the School Board at another public meeting on April 2, 2001. The Facilities Committee proposed two closure options–both proposals contemplated the closure of Rimrock School and Beartooth School, and recommended alternative options for the closure of at least one other school.

¶12 On April 3, 2001, the School Board sent a letter to parents which outlined the Facilities Committee's recommendation. The letter indicated that the School Board would hold another meeting on April 9, 2001, for the public to attend and provide comment before the School Board reached its final decision. Upon receiving the letter, Bryan joined with a coalition of Rimrock parents to rebut the recommendation to close Rimrock School. On April 4, 2001, one of the Rimrock parents, Lisa Schroeder, spoke with the District's superintendent and requested a "head-to-head comparison" of the schools based on the criteria examined by the Facilities Committee. The superintendent claimed that she did not have such a comparison and was not certain whether one even existed.

¶13 On April 5, 2001, Schroeder observed Cabrera in a television interview standing next to a stack of documents. According to Schroeder, Cabrera stated that each of the local schools had been itemized on a spreadsheet and compared to one another. Therefore, on April 6, 2001, Schroeder called the superintendent's office with another request for the purported comparison. Again, the office

5

denied having any knowledge about such a comparison. Schroeder also sent an email request for the comparison to a member of the School Board but received no response.

¶14 On April 9, 2001, the School Board held its final meeting on the school closure issue. Members of the public, including Bryan, addressed the School Board about the recommendation and urged the Board not to close Rimrock School. After the public comment period concluded, the School Board began its discussion on the school closure recommendation. At that point, Cabrera distributed spreadsheets to the School Board which contained the rating system. Cabrera then described the point allocation to the School Board but did not distribute this version of the spreadsheet to the public. The Rimrock parents did not obtain the spreadsheet containing the rating system until the morning of April 10, 2001. However, by that point, the School Board had already voted to accept the Facilities Committee's recommendation and close Rimrock, Beartooth, and Garfield Schools.

¶15 On May 8, 2001, Bryan filed a complaint against the District which requested that the District Court nullify the School Board's school closure decision and order disclosure of all documents related to that decision. Bryan also requested that the District Court issue a writ of prohibition precluding the District from implementing the school closure decision and a writ of mandate ordering the District to comply with a specified school closure policy. On July 19, 2001, following an evidentiary hearing, the

6

District Court denied the relief requested by Bryan and dismissed her complaint. Bryan appeals the District Court's judgment.

## STANDARD OF REVIEW

¶16 Bryan maintains that she is appealing the District Court's "ruling as to the right to know and the right to participate." Our review of questions involving constitutional law is plenary. *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 28, 303 Mont. 274, ¶ 28, 16 P.3d 1002, ¶ 28. A district court's resolution of an issue involving a question of constitutional law is a conclusion of law which we review to determine whether the conclusion is correct. *Schuff*, ¶ 28.

## DISCUSSION

## ISSUE ONE

¶17 Is an advisory committee, established by a school board, subject to the constitutional mandates prescribed in Article II, Section 9 of the Montana Constitution?

¶18 Before we address the merits of this case, we must first address whether Bryan had standing to file this suit against the District. In a footnote in its response brief, the District asserts that "Bryan cannot 'represent' Lisa Schroeder and claim Ms. Schroeder's 'injury' as her own. If Ms. Schroeder's right to examine documents was allegedly infringed, Ms. Schroeder is the only one with standing." Bryan notes that the District has raised the standing argument for the first time on appeal in a footnote, consisting of two sentences. Nevertheless, Bryan insists that we should reject the District's standing challenge.

7

¶19 As a general rule, this Court does not address issues raised for the first time on appeal. *Day v. Payne* (1996), 280 Mont. 273, 276, 929 P.2d 864, 866. However, standing is a threshold, jurisdictional requirement of every case. *Matter of Paternity of Vainio* (1997), 284 Mont. 229, 235, 943 P.2d 1282, 1286. The general rule does not pertain to jurisdictional issues. *State v. Abe*, 2001 MT 260, ¶ 14, 307 Mont. 233, ¶ 14, 37 P.3d 77, ¶ 14.

¶20 In the past we have stated that a complaining party must satisfy the following criteria to establish standing: (1) the party must clearly allege past, present, or threatened injury to a property or civil right; and (2) the alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party. *Armstrong v. State*, 1999 MT 261, ¶ 6, 296 Mont. 361, ¶ 6, 989 P.2d 364, ¶ 6. Stated another way, to satisfy the standing requirement, a plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens presentation of issues." *District No. 55 v. Musselshell County* (1990), 245 Mont. 525, 528, 802 P.2d 1252, 1254.

¶21 The evidence presented at the evidentiary hearing indicated that the Rimrock parents, including Bryan, worked in concert to rebut the school closure recommendation. Toward this end, the parents delegated duties amongst themselves to maximize the collective efficiency. Although it was Schroeder who propounded the request for information, and not Bryan, she did so on behalf of the Rimrock parents' common purpose. To conclude that Bryan did

not have a personal stake in the controversy simply because she did not personally request the subject information would result in a hypertechnical standing interpretation contrary to the broad policies and protections afforded by Article II, Sections 8 and 9 of the Montana Constitution. As such, we conclude that Bryan had a personal stake in the litigation and, thus, had standing to file the present action. Having resolved this jurisdictional challenge, we now turn to the merits of the appeal.

¶22 Bryan states that the delegates to the 1972 Montana Constitutional Convention enacted Article II, Sections 8 and 9 of the Montana Constitution to increase public involvement in the decision making processes of unelected, bureaucratic entities. Bryan argues that "[t]o allow a public body to evade the right to know and the right to participate by delegating the bulk of its work to committees . . . would be to sanction the abdication of sovereignty and responsibility" that the delegates and Legislature rejected. Bryan insists that the Facilities Committee was subject to the mandates of Article II, Section 9 of the Montana Constitution. Bryan does not address whether the Facilities Committee was subject to the Article II, Section 8, right of participation.

¶23 The Montana Constitution is to be given a broad and liberal interpretation. *SJL of Mont. Assoc. v. City of Billings* (1993), 263 Mont. 142, 146, 867 P.2d 1084, 1086. While the Legislature is free to pass laws implementing constitutional provisions, its interpretations and restrictions will not be elevated over the

9

protections found within the Constitution. *In re Lacy* (1989), 239 Mont. 321, 325, 780 P.2d 186, 188. In resolving disputes of constitutional construction, this Court applies the rules of statutory construction. Under those rules, the intent of the framers of the Constitution is controlling and that intent must first be determined from the plain language of the words used. *Butte-Silver Bow Local Govern. v. State* (1989), 235 Mont. 398, 403, 768 P.2d 327, 330.

¶24 Article II, Section 8 of the Montana Constitution provides:

> **Right of participation.** The public has the right to expect governmental agencies to afford such reasonable opportunity for citizen participation in the operation of the agencies prior to the final decision as may be provided by law.

The Legislature has codified guidelines to protect the Article II, Section 8, guarantees at § 2-3-101, et seq., MCA. Article II, Section 9 of the Montana Constitution provides:

> **Right to know.** No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

The Legislature has promulgated guidelines to protect the Article II, Section 9, guarantees in Montana's open meeting statutes, codified at § 2-3-201, et seq., MCA. One of these open meeting statutes, § 2-3-203(1), MCA, provides:

> All meetings of public or governmental bodies, boards, bureaus, commissions, agencies of the state, or any political subdivision of the state or organizations

10

> or agencies supported in whole or in part by public funds
> or expending public funds must be open to the public.

Further, § 2-3-203(5), MCA, provides that "[a]ny committee or subcommittee appointed by a public body . . . for the purpose of conducting business which is within the jurisdiction of that agency is subject to the requirements of this section."

¶25 As indicated in the language in the constitutional provisions, Article II, Section 9, is broader in application than Article II, Section 8. Article II, Section 9, applies to public bodies as well as governmental agencies. In *Common Cause v. Statutory Committee* (1994), 263 Mont. 324, 330, 868 P.2d 604, 608, we defined "public or governmental body" as a group of individuals organized for a governmental or public purpose.

¶26 The Legislature has instilled in the trustees of a school district the authority to close schools in the district. *See* §§ 20-3-324(7) and 20-6-509, MCA. Here, the District assembled a group of individuals to research and prepare a recommendation on the very closure issue which the Legislature assigned to the District itself. Therefore, for purposes of the above described duties, the Facilities Committee assumed the identity of the District, albeit through a different composition of constituents. In researching the school closure proposition and submitting a recommendation to the School Board, the Facilities Committee performed a legislatively designated governmental function. This function served a clear public and governmental purpose–to assist the District in its school closure determination. Accordingly, we hold that the Facilities Committee constituted a "public or

11

governmental body" subject to the strictures of Article II, Section 9 of the Montana Constitution.

ISSUE TWO

¶27 Did the District violate Bryan's constitutional right to know and participate?

¶28 The District Court's conclusions of law contain four sections entitled "Writ of Mandate," "Writ of Prohibition," "Right to Participate," and "Right to Know//Open Meetings." In the "Right to Know//Open Meetings" section, the District Court concluded that the District did not violate Bryan's constitutional right to know because "it provided [Bryan] and the general public the right to observe its deliberations and to access all public records considered and generated in making its decision." In the "Right to Participate" section, the District Court concluded that the District adequately notified the public regarding pertinent meetings and sufficiently afforded Bryan "a reasonable opportunity to submit data, views, or arguments orally and in written form." Therefore, the District Court denied Bryan the relief she requested and dismissed her complaint.

¶29 Bryan maintains that the District Court erred at the outset when it segregated its right to participate and right to know analyses. Bryan contends that Article II, Sections 8 and 9, are inextricably linked by way of Article II, Section 8's, "reasonable opportunity" proviso. The District, on the other hand, insists that the Article II, Section 8 and 9, rights "are separate and distinct." It argues that neither Article II, Section 8, nor its

12

implementing statutes, condition participation on a prior review of documents.

¶30 The delegates' discussions regarding the adoption of Article II, Sections 8 and 9, do not appear to support the District's "separate and distinct" proposition. Admittedly, the delegates did not often refer specifically to the two provisions' interrelationship during their open discussions. However, there are several references in the Constitutional Convention transcripts which reveal the fundamental link between the right to know and participate. In expressing reservations about the privacy exception contemplated in the right to know, Delegate Martin claimed that an exception "could close much of government to all citizens, frustrating their ability to *participate* in the decision making process . . . ." Montana Constitutional Convention, Vol. V at 1672 (emphasis added). Later, Delegate Ask reiterated that "we have in the Bill of Rights . . . that they want . . . to participate in government-the right to know, the right to participate." Montana Constitutional Convention, Vol. VII at 2560.

¶31 Perhaps we find little discussion regarding the provisions' interrelationship because of the resounding clarity in the comments to Article II, Section 9. In the comments accompanying Article II, Section 9, the Bill of Rights Committee stated:

> The committee, with two dissenting votes, and after considerable reflection, adopted this provision explicitly establishing a public right to know. . . . *It is a companion to the preceding right of participation.* Both arise out of the increasing concern of citizens and commentators alike that government's sheer bigness threatens the effective exercise of citizenship. The committee notes this concern and believes that one step

13

> which can be taken to change this situation is to Constitutionally presume the openness of government documents and operations.  [Emphasis added.]

Montana Constitutional Convention, Vol. II at 631.  While the two provisions do contain somewhat different language and prescribe somewhat different rights, the above comment clearly indicates that the Bill of Rights Committee, and subsequently the delegates as a whole, acknowledged the inextricable association between the "companion" provisions.  For, as some commentators have noted, "[t]o participate effectively and knowledgeably in the political process of a democracy one must be permitted the fullest imaginable freedom of speech and one must be fully apprised of what government is doing, has done, and is proposing to do."  Larry M. and Deborah E. Elison, *Comments on Government Censorship and Secrecy*, 55 Mont. L. Rev. 175, 177 (1994).  Therefore, we will not analyze the two provisions in a vacuum, "separate and distinct" from one another, as urged by the District.  We now turn our attention to the particulars of the purported violations.

### A.  Right to Know

¶32 As indicated above, Article II, Section 9, contains two components: the right to examine documents and the right to observe the deliberations of public bodies or agencies. Bryan argues that the spreadsheet which contained the rating system was a public document subject to public examination.  Therefore, Bryan alleges that the District violated her right

to examine documents when it failed to distribute the rating system version of the spreadsheet following the Rimrock parents' request.

14

¶33  As we stated in *Becky v. Butte-Silver Bow Sch. Dist. 1* (1995), 274 Mont. 131, 136, 906 P.2d 193, 196:

> Any review of Article II, Section 9, of the Montana Constitution necessarily involves a three-step process. First, we consider whether the provision applies to the particular political subdivision against whom enforcement is sought. Second, we determine whether the documents in question are "documents of public bodies" subject to public inspection. Finally, if the first two requirements are satisfied, we decide whether a privacy interest is present, and if so, whether the demand of individual privacy clearly exceeds the merits of public disclosure.

We have already determined that Article II, Section 9, applied to the actions of the Facilities Committee. Further, this case does not implicate the "privacy interest" prong of the three-part test, nor does the District assert otherwise. Therefore, for purposes of Bryan's Article II, Section 9, allegation, we need only examine whether the requested spreadsheet was a "document of a public body" subject to public inspection.

¶34  The District and Amicus Curiae indicate that the Legislature has promulgated statutes to implement an individual's right to examine documents at § 2-6-101, et seq., MCA. According to the District and Amicus Curiae, the public is entitled to examine only those documents which constitute "public writings," pursuant to § 2-6-101(2), MCA. The District insists that "the spreadsheet did not constitute a public writing until it was considered and relied upon by Board members to make their decision at the April 9, 2001 meeting" and, therefore, not subject to the right of examination until that time.

¶35  In *Becky*, 274 Mont. at 137, 906 P.2d at 196, this Court acknowledged that "the Montana Constitution does not define

15

'documents . . . of . . . public bodies.'" We noted that the definition of "public writings," contained in § 2-6-101(2), MCA, proved useful in interpreting the constitutional language. However, we then departed somewhat from the narrowly crafted definition of "public writings" and stated:

> Although "documents of public bodies" is not defined in the Montana Constitution, it must reasonably be held to mean documents generated or maintained by a public body which are somehow related to the function and duties of that body.

*Becky*, 274 Mont. at 138, 906 P.2d at 197. Therefore, while we did discuss the "public writings" factors delineated in § 2-6-101(2), MCA, we ultimately interpreted the constitutional "documents of public bodies" much more broadly than the legislative construct.

¶36 As indicated above, the Facilities Committee was a public body. Further, Cabrera generated the spreadsheet and rating system to assist in the function of that body's charge, while acting in his capacity as a member of the Facilities Committee. Therefore, we conclude that the spreadsheet was a document of a public body subject to public inspection prior to the April 9, 2001, board meeting.

¶37 In apparent anticipation of this conclusion, the District claims that it did not violate Bryan's right to know because the Rimrock parents did not make an "intelligent request" for the document. The District indicates that the Rimrock parents contacted the superintendent's office and requested a "head-to-head comparison" of the schools which contemplated some thirty-five various criteria. The District insists that no such document existed. Therefore, as the parents did not submit an intelligent

16

request for the desired spreadsheet, the District maintains that it did not violate Bryan's right to examine public documents.

¶38 As indicated above, the Rimrock parents contacted the District's chief administrator on April 4, 2001, and requested a head-to-head comparison of the affected schools. The District denied knowledge of any information regarding such a comparison. On April 6, 2001, the Rimrock parents again phoned the superintendent's office with a request for the purported comparison. However, this time, the parents propounded a more specific request–they requested a copy of the spreadsheet to which Cabrera referred in his April 5, 2001, television interview. Again, the District claimed ignorance but now implies that had the parents framed their request in a different manner, they may have achieved a better result.

¶39 When the delegates adopted Article II, Section 9, they essentially declared a constitutional presumption that every document within the possession of public officials is subject to inspection. *See Associated Press, Inc. v. Department*, 2000 MT 160, ¶ 85, 300 Mont. 233, ¶ 85, 4 P.3d 5, ¶ 85 (Nelson, J., specially concurring). Yet, the District would purport to temper the constitutional right of inspection based on the gatekeeper's interpretation of the request. To impose such a hypertechnical constraint on the lay public would frustrate the maxim of liberal interpretation and subvert the constitutional mandate on open government. Here, it certainly does not shock the bounds of reason to consider that one might contact a school district's chief administrator in an effort to acquire information on school

17

closures.  Further, the Rimrock parents' request for "Cabrera's head-to-head comparison" is not so unintelligible that it justifies nondisclosure.  Therefore, we hold that the District violated Bryan's right to examine public documents when it failed to divulge the rating system version of the spreadsheet for public inspection upon request.  Consequently, the District Court erred when it concluded otherwise.

### B.  Right to Participate

¶40  Before we delve into the merits of the parties' arguments on Article II, Section 8, we find it useful to reference the provision's genesis and the delegates' motivation for memorializing such a protection.  In its accompanying comments to the proposed text of Article II, Section 8, the Bill of Rights Committee stated:

> The committee unanimously adopted this section in response to the increased public concern and literature about citizen participation in the decision-making processes of government.  The provision is in part a Constitutional sermon designed to serve notice to agencies of government that the citizens of the state will expect to participate in agency decisions prior to the time the agency makes up its mind.  In part, it is also a commitment at the level of fundamental law to seek structures, rules and procedures that maximize the access of citizens to the decision-making institutions of state government.  The committee believes that this is eminently proper and that it will have a salutary effect not only on the quality of the final decisions, but more important, on the deliberative and political capabilities of the citizenry.  It is hoped that this provision will play a role in reversing the dissatisfactions increasingly expressed regarding bureaucratic authority insulated from public scrutiny and participation.

Montana Constitutional Convention, Vol. II at 630-31.  Further, in deliberations prior to the adoption of Article II, Section 8, delegates offered the following insight into the scope of the right of participation:

18

Delegate Dahood: What is intended by Section 8 is that any rules and regulations that shall be made and formulated and announced by any governmental agency, which of course are going to affect the citizens of this state and the common welfare, shall not be made until some notice is given so that the citizen will have a reasonable opportunity to participate with respect to his opinion, either for or against that particular administrative action.

. . . .

Delegate Foster: . . . I think that we should be very well aware of what this committee is attempting to do. The continuing growth of bureaus has brought a new dimension to our representative form of government. We have drawn clearer lines of election for legislative officials. We have devised a more responsive system of selection and election for judicial officials. We have retained an extensive elective process for our executive officials. But what of the bureaus, the long arm of government with which the average citizen most often comes in contact; the long arm of government which is not responsive to elective officials; the long arms of government with which many, if not most, of our Montana citizens have met frustrating resistance and/or indifference? Elections do not materially affect the bureaus. Political pressures are not sufficient to juvenate [sic] response to public need. Public awareness and access seem to be the only tools to remind the great mass of public servants that their job is to serve the needs of the public and no other; they are paid by tax dollars to benefit the public above all else.

Montana Constitutional Convention, Vol. V at 1655, 1657.

¶41 Using the aforementioned directives as a backdrop, we now turn to the parties' Article II, Section 8, contentions. Since the District failed to disclose the requested information, Bryan insists that the District did not afford her a reasonable opportunity to participate on April 9, 2001. In other words, Bryan claims that she could not effectively exercise her Article II, Section 8, right to participate on April 9, 2001, because the District violated her Article II, Section 9, right to examine public documents. The District concedes that a school board is an

19

agency subject to the provisions of Article II, Section 8. However, the District suggests that an individual's reasonable opportunity to participate is satisfied when the "person succeeds in submitting her views to the agency." The District claims that it fulfilled its obligations to Bryan as it distributed the information considered by the School Board and provided her with an opportunity to speak at its April 9, 2001, meeting.

¶42 Essentially, the parties' dispute hinges on the interpretation of the "reasonable opportunity" language found in Article II, Section 8, and § 2-3-111, MCA. In discussions prior to the provision's adoption, Delegate Garlington expressed similar concerns regarding the opportunity prescribed in Article II, Section 8:

> Mr. Chairman, I have said before, I think it is the responsibility of this body to be-to deliberate carefully and not to do things that are going to create a lot of difficulty and confusion in the future. I am concerned about what is meant by the phrase "opportunity for citizen participation in the operation of government." . . . And I bring this up so that we can look at these words and make sure that whatever we draft here really states what our intention is and if there are limits to what we're authorizing.

Montana Constitutional Convention, Vol. V at 1654-55. While the delegates did not specifically debate the definition of "reasonable," Delegate Dahood did offer this insight into the term:

> Mr. Chairman, I do not experience any particular problem in having the word "reasonable" substituted. I'm sure that my committee would not have any particular difficulty. I think, in our judgment, feasible was synonymous with reasonable but somewhat more expansive; but I think, as a lawyer, having been confronted with the use of the word "reasonable" so many times, having seen it defined so many times, that I think the definition that the law would give it would certainly serve the purpose that we intend to serve by Section 8.

20

Montana Constitutional Convention, Vol. V at 1653.

¶43 Black's Law Dictionary defines "reasonable" as "1. Fair, proper, or moderate under the circumstances . . . ." Black's Law Dictionary 1272 (7th ed. 1999). Within the context of Rule 12(c), M.R.Civ.P., this Court has stated that a party has a "reasonable opportunity" to act if he or she is "fairly apprised." *See Rafanelli v. Dale*, 1998 MT 331, ¶ 22, 292 Mont. 277, ¶ 22, 971 P.2d 371, ¶ 22. Other jurisdictions have expanded upon these equitable notions to include a "meaningful" component to the "reasonable" standard. *See Schwartz v. Town Plan & Zoning Commission* (Conn. 1975), 357 A.2d 495, 497 (conducting a just public hearing means that the public is given the opportunity to participate "at a meaningful time and in a meaningful manner . . . ."); *Florida Power & Light Co. v. United States* (D.C.Cir. 1988), 846 F.2d 765, 771 ("The APA requires the Commission to provide notice of its proposed rulemaking adequate to afford 'interested parties a reasonable opportunity to participate in the rulemaking process.' Such notice must not only give adequate time for comments, but also must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully.")

¶44 While we decline this opportunity to adopt some mechanical formula interpreting "reasonable opportunity," we conclude that, at a minimum, the "reasonable opportunity" standard articulated in Article II, Section 8, and § 2-3-111, MCA, demands compliance with the right to know contained in Article II, Section 9. It is evident from the comment to Article II, Section 8, that the

21

delegates sought to expose the activities of those bureaucratic authorities which were once isolated from public scrutiny. However, if we adopt the District's position, agencies could once again invoke the autonomy of the long arm government structure through delegation. Such a superficial interpretation of the right to participate to simply require an uninformed opportunity to speak would essentially relegate the right of participation to paper tiger status in the face of stifled disclosure and incognizance. Given the tenor of the delegates' insistence upon open government and citizen participation, we find it improbable that they envisioned and subsequently memorialized such a hollow right.

¶45 Certainly, as the District suggests, Bryan was given the opportunity to voice her concern regarding the school closure recommendation. However, she participated under a distorted perspective in light of the District's partial disclosure of information. At the evidentiary hearing, Bryan testified that upon receiving the rating system, following the April 9, 2001, meeting, she identified many serious flaws and errors in its analysis. She claims that "she could have undermined the basis for the committee's recommendation if she had had the opportunity . . . [and] might have swayed the one vote that was needed to keep her children's school from being closed."

¶46 As the United States Supreme Court stated:

> The right to a hearing embraces not only the right to present evidence, but also a reasonable opportunity to know the claims of the opposing party and to meet them. The right to submit argument implies that opportunity; otherwise the right may be but a barren one. Those who are brought into contest with the Government in a quasijudicial proceeding aimed at the control of their

22

> activities are entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command.

*Morgan v. United States* (1938), 304 U.S. 1, 18-19, 58 S.Ct. 773, 776, 82 L.Ed. 1129.

In essence, when the District violated Bryan's right to know, it reduced what should have been a genuine interchange into a mere formality. Therefore, we hold that the District did not provide Bryan with a "reasonable opportunity" to participate at the April 9, 2001, meeting. Consequently, the District Court erred when it concluded that the District did not violate Bryan's Article II, Section 8, right of participation.

## ISSUE THREE

¶47 If the District violated Bryan's constitutional right to know and participate, to what remedy is Bryan entitled?

¶48 In light of the constitutional violations referenced above, Bryan requests that we void the School Board's decision pursuant to § 2-3-114, MCA. In the alternative, Bryan requests that a "declaratory judgment be entered that she was denied the right of participation." The District, relying upon *Common Cause*, claims that if we determine the Facilities Committee violated Bryan's constitutional rights discussed herein, we should void the Facilities Committee's report and recommendation and not the School Board's final decision.

¶49 The District's reliance on *Common Cause* is misplaced. In *Common Cause*, a committee was established, pursuant to § 13-37-102, MCA, to submit a list of candidates for the office of Commissioner

23

of Political Practices to the governor for consideration. Ultimately, the governor interviewed all five of the recommended candidates and announced the appointment of one of the nominees. The plaintiffs filed suit against the committee and governor and sought to void the committee's submission of the list and the governor's appointment. The plaintiffs asserted that, in compiling the list of candidates, the committee violated Montana's open meeting statutes and Article II, Section 9 of the Montana Constitution.

¶50 This Court held that the committee did in fact violate the open meeting statutes. *Common Cause*, 263 Mont. at 331, 868 P.2d at 609. However, as to the remedy for the violation, we concluded:

> [B]ecause the Committee's submission of the names is statutorily independent of the governor's choice and not in any way binding on that choice, we also conclude that the Committee's statutory violation does not require that the entire appointment process be voided. . . .
>
>   Notwithstanding the unique circumstances of this case, open meetings violations remain of utmost concern to this Court. Nothing in this opinion should be interpreted to suggest that violations of open meeting laws by *any* entity subject to those laws will not result in voiding decisions so reached. We will not hesitate to affirm a district court's determination to void such decisions or reverse a court's refusal to do so.

*Common Cause*, 263 Mont. at 333-34, 868 P.2d at 610. Therefore, we clearly limited the effect of our holding in *Common Cause* to the "unique circumstances" of that case, i.e., the statutory independence of the committee and its recommendation. This case simply has not presented similar circumstances. Further, unlike Bryan, the plaintiffs in *Common Cause* did not allege a violation of their right of participation. For the foregoing reasons, *Common*

24

*Cause* proves inapposite to our consideration of an appropriate remedy in the case at bar.

¶51 Section 2-3-114, MCA, provides:

> **Enforcement.** The district courts of the state have jurisdiction to set aside an agency decision under this part upon petition made within 30 days of the date of the decision of any person whose rights have been prejudiced.

There is no dispute in this case that Bryan filed the petition within thirty days of the School Board's decision. Further, Bryan's rights have clearly been prejudiced as indicated in our analysis of the constitutional violations. Therefore, the question presented becomes one of redress, i.e., should we void the School Board's decision and force the parties to start anew or should we simply issue a declaratory judgment and permit the decision to stand?

¶52 We conclude that the facts in this case and its implications on future conduct compel the former remedial measure. While the District did notify the public about the April 9, 2001, meeting and allow for public comment prior to reaching its decision, the public was not provided all of the information presented to the School Board for its consideration. Therefore, the constitutional violation "taint[ed] the entire process from start to finish." *See Common Cause*, 263 Mont. at 334, 868 P.2d at 610 (Hunt, J., dissenting). To simply declare a constitutional violation and yet allow the decision to stand would set a regrettable precedent. In the future, we presume that the prospect of negligible consequences would invoke concomitantly negligible deterrence. Here, we simply are not prepared to sacrifice Bryan's constitutionally prescribed

25

right to know and participate for the sake of convenience. Therefore, we declare the School Board's closure decision null and void and hold that the District Court erred when it failed to do so.

¶53 We in no way mean to insinuate that a devious intent mobilized the District to appoint the Facilities Committee for the designated task. Likewise, we do not intend to suggest that the District deliberately concealed information or disingenuously evaded the Rimrock parents' requests. To the contrary, the record indicates that the District undertook extraordinary measures to reach a thoughtful, albeit difficult, determination. However, regardless of the inadvertent nature of the omission, the procedure to which Bryan was subjected did not comport with the constitutional safeguards prescribed by Article II, Sections 8 and 9 of the Montana Constitution. This actuality leaves us with no viable option other than voiding the District's decision. While the circumstances of this case compel an unfortunate result, the vigilant protection of one's constitutional rights warrants such a disposition.

¶54 So as to obviate the likely alarm generated by our holding, we believe it is important to articulate what this Opinion does and does not require of the parties on remand. This Court in no way intends to express an opinion about the school closure determination, or impose our will regarding the same upon the District. Therefore, this Opinion does not command the District to reopen those schools it has already closed. In fact, Bryan has not requested such relief on appeal.

26

¶55 At oral argument, this Court inquired of Bryan, "What happens if we agree with your argument here, and agree with your remedy which is to void that order? In a practical sense, what happens?" Bryan responded as follows:

> In a practical sense, we go back to the Board . . . and make the argument that she made in court . . . on the merits . . . with this [new] information. The Board can then decide whatever they want to do. . . . If they want to reaffirm the decision, that is their prerogative. But at least then she will have had the opportunity to say her piece with the information that she needed.

Therefore, per Bryan's request, this Opinion effectively voids the School Board's April 9, 2001, closure decision. On remand, the School Board shall allow Bryan another opportunity to rebut the closure recommendation. It is then within the School Board's discretion to reexamine the closure determination, in light of Bryan's fully informed presentation, and affirm or modify its prior decision.

¶56 Accordingly, the District Court's judgment is reversed and remanded for entry of judgment consistent with this Opinion.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ TERRY N. TRIEWEILER
/S/ PATRICIA COTTER
/S/ JIM RICE

27