FILED

04/14/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0550

DA 25-0550

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 78

DANIEL W. TORGISON,

Plaintiff and Appellant,

v.

LINCOLN COUNTY PORT AUTHORITY,
a division of LINCOLN COUNTY,
THE LINCOLN COUNTY COMMISSIONERS,
and JOHN DOES ONE THROUGH FIFTEEN,

Defendants and Appellees.

APPEAL FROM:     District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DV-27-2025-061
Honorable Luke Berger, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Amy N. Guth, Attorney at Law, P.C., Libby, Montana

For Appellees Lincoln County and Lincoln County Commissioners:

Jordan Y. Crosby, James R. Zadick, Seth T. Bonilla, Ugrin Alexander
Zadick, P.C., Great Falls, Montana

For Appellee Lincoln County Port Authority:

Reid J. Perkins, Worden Thane P.C., Missoula, Montana

Submitted on Briefs:   February 18, 2026

Decided:   April 14, 2026

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1      Plaintiff Daniel W. Torgison (Torgison) appeals the Order on Motion for Preliminary Injunction entered by the Nineteenth Judicial District Court, Lincoln County, which denied his request for injunctive relief based upon alleged violations of open meeting and right to participate laws.  We consider:

> *Whether the District Court manifestly abused its discretion by denying Torgison's motion for preliminary injunction.*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2      The Lincoln County Board of Commissioners (County Commissioners), pursuant to authority granted in § 7-14-1102, MCA, created the Lincoln County Port Authority (the Port) in 2003.  The purpose of creating the Port was to stimulate economic development within the County and to increase the County's tax bases.  The County Commissioners' Resolution 609, which originally created the Port, specified that nine (9) individuals, "one of whom shall be a sitting Lincoln County Commissioner," were to serve on the Port's Board of Commissioners, appointed by the County Commissioners.   The Board's composition was changed by resolution in 2018 and later by the County Commissioners' adoption of bylaws for the Port that provided for up to seven board members, including one County Commissioner to serve as a Port Commissioner.

¶3      Soon after its organization in 2003, the Port assumed ownership of approximately 400 acres of land in Lincoln County known as the Kootenai Business Park (Business Park), acquired after Stimson Lumber Company ceased operations on the property.  The Business

2

Park is a dual superfund site with a contaminated groundwater area and land contaminated with asbestos from vermiculite that was locally mined and transported to the Business Park property, as well as the location of large amounts of concrete waste.

¶4 In March 2022, the Port entered a Memorandum of Understanding (Memorandum) with Noble Industries, LLC (Noble) to explore development of the property, with an initial six-month due-diligence period for Noble to assess its further involvement with the Business Park, specifically:

> to study the development opportunities in the Kootenai Business Park (KBP) including acquiring land, relocating an existing excavation business, development of a specialty medium density fiberboard plant, renovation and development of a commercial building, construction of a new access road to serve the industrial and commercial users of the KBP, and related improvements.

At about the same time, the Port and Noble also entered a licensing agreement whereby Noble agreed and was authorized to perform certain pre-development and cleanup work in the Business Park, including:

> removing abandoned vehicles, miscellaneous metal debris, rock and wood waste piles, bags of hemp waste, woody debris, shipping containers and garbage; demolition and removal of abandoned and deficient structures; snow removal; preliminary site layout surveys; hauling gravel and fill onto the Property in preparation for surface grading; and related activities and improvements.

Other than a County Commissioner's service within the Port's governance, the County was not a party or otherwise involved in the formation of the agreements.

¶5 Pursuant to these agreements, Noble undertook development investigation efforts and conducted cleanup operations in the Business Park, expending about $600,000 in these

3

efforts. On December 9, 2022, Noble sent a letter to the Port outlining a "conceptual agreement" for the purpose of purchasing 185 acres in the Business Park. At a Port meeting on December 27, 2022, "the following terms and conditions were agreed to for the sale of property" to Noble, according to a Port document titled "Preliminary Agreement" and signed January 4, 2023. The Agreement acknowledged that the parties may conduct further negotiations that were subject to the approval of the Port, but the Agreement was not made subject to approval of the County Commissioners. Ultimately, the parties closed on the sale of 105 acres in December 2023, for a cash purchase price of $1.6 million, with a credit of $600,000 for the costs Noble had expended on the property by that time, which also included, according to testimony at the preliminary injunction hearing, re-grading the property, installing a sewer and a waterline, and commencing a new concrete facility. Later, Noble sold a portion of this property to a third party.

¶6 The parties' factual positions diverge regarding the conducting of the Port's meetings, including the provision of public notice and the opportunity for public participation, and most of these conflicts were not resolved by the District Court. In its initial order denying the request for a preliminary injunction, the District Court, with few exceptions, did not enter findings of fact on these issues, but rather, "setting aside" those contentions, disposed of the motion on other grounds, as discussed below. Therefore, we provide the following simply to frame the issue for the discussion herein.

¶7 Torgison's Complaint alleged generally that neither the Port nor the County "publicize the meetings of the [Port] or post proper notice of the time and location of its meetings," publicize the Port's meeting agendas, and since May of 2022, publicly post any

4

meeting minutes. In his affidavit in support of the motion for preliminary injunction, Torgison averred that, after May 2022, "Lincoln County stopped posting any information with respect to the [Port] on its website other than the time of its meetings and the wrong meeting location for the meetings." The Complaint further alleged that, "[u]pon information and belief, the [Port] has taken action to transfer real and personal property without extending the opportunity for the public to participate in the decision making or to comment as to the proposed transaction," and, based upon "information and belief, as a result of lack of transparency, the [Port] has entered into agreements that were not fiscally viable[.]" Torgison's appellate briefing broadly contends that "[i]t is not contested that between May of 2022 to April of 2025, the Port concealed its activities by failing to post its agendas or provide accurate notice of the location of its meetings." At the preliminary injunction hearing on June 20, 2025, testimony focused specifically on the Noble transaction. Torgison testified as follows during cross-examination by the County's counsel:

Q. Your entire lawsuit is based off of rumors. Is that correct?

A. That there's been massive rumors down there for a couple years.

Q. So --

A. Ever since this -- this land thing come to light.

Q. And so, this land thing as you're talking about, that's the Noble sale, correct?

A. Correct.

Q. And if I'm understanding your testimony correctly, it came to light a couple of years ago; is that correct?

5

A.  Some of the rumors started -- started coming through because it was not put out for bid. I've had developers come to me. I worked for Mr. Noble for nine years.

.  .  .

Q.  When that first developer came to you a couple of years ago, is that when you first learned of the sale to Mr. Noble by the Port Authority?

A.  Yes. I did see the sign up that he put up.

Q.  Okay.  And when did you see that sign?

A.  Might have been last fall, this spring, I don't know.

Q.  Last fall in 2024. Is that correct?

A.  Possibly, or it was this spring when he put it up. I drive by it every day, but I don't pay that much attention.

Q.  So, you drive by the, the business park each day?

A.  Daily if I'm in town, and I'm in town a lot.

Q.  And you can see what activity is going on there?

A.  Oh, absolutely. Absolutely. You can see the dust from my house.

¶8      The Port largely contested the notice issue, contending it was in compliance with statutory notice requirements until additional requirements were enacted, effective October 1, 2023, including the publishing of meeting agendas in the newspaper and online. *See* § 2-3-103(1)(b), MCA; 2023 Mont. Laws ch. 396.  Former Port Commissioner and former legislator Jerry Bennett testified that during his tenure on the Port Board, from 2017 to 2025, advance notices of Port meetings were posted on the bulletin board of the County

6

Courthouse, where other public notices were likewise posted.[1]  Public comment was permitted during Port Board meetings.  Bennett testified he was not timely advised of the additional statutory notice requirements that went into effect October 1, 2023, and thus did not also comply with those, but the Port's briefing proffers that "the Board meetings in which the decision to sell to Noble was made were in 2022, prior to the 2023 revisions to M.C.A. § 2-3-103.  The decision to sell was made in 2022."  It notes that counsel for Torgison emailed the Port in April 2023 asking for information about the Noble transaction, an indication that information was not concealed from the public.[2]

¶9      Torgison filed this action in April 2025, asserting violation of open meeting laws, his right to participate, and his right to know, and asking that "[a]ctions taken by the [Port] that do not conform to the requirements for public participation," or which "are in violation of the open meeting law," be declared void.  Torgison filed an application for a restraining order and preliminary injunction on April 10, 2025, stating therein that "the actions taken by the [Port] between May of 2022 to April of 2025 are voidable by this [c]ourt."  In view of the relief requested, Noble testified at the preliminary injunction hearing about the efforts of his company on the Business Park and the potential jeopardy of having the prior contracts voided.

---

[1] One question directed to Bennett asked about the posting of both agendas and minutes, to which he answered that he had posted "them" on "County posting sites," but the specific issue of posting of meeting minutes was not separately explored further with Bennett.

[2] The Port states it is now in compliance with the 2023 revisions to § 2-3-103, MCA.

¶10 The District Court issued its Order on Motion for Preliminary Injunction (Order) on July 18, 2025, denying the motion. Its reasoning was based primarily on the nature of the relief sought:

> The injunction requested in writing and in open court by the Plaintiff is not limited to enforcement of the open meeting laws, rather it requests the County and Port Authority to cease from acting on any matter related to decisions made by the Port between May 2022 until April 2025. . . . [T]he *real request here in the injunction* is to invalidate the prior contracts entered into for the sale of Port Authority land stopping those owners, who are not parties to this litigation, from use of their land, and invalidating other contracts or agreements. Torgison testified at the hearing he does not believe the prior sales, which came to light to him 1.5 to 2 years ago, were done correctly and he believes not only should any future sales stop, but everything should revert back to before the sales.
>
> .   .   .
>
> [T]he [c]ourt is concerned for the Plaintiff's likelihood to succeed not solely on the violation of the open meeting law, but on the ultimate request to vacate the contracts.

(Emphasis added.)

¶11 Torgison filed an appeal from the District Court's Order. After filing his notice of appeal, he filed a motion for a preliminary injunction pending appeal pursuant to M. R. App. P. 22(1)(a)(iii) in the District Court. The District Court reasoned the motion was deficient for failing to demonstrate the elements for an injunction and had failed "to address any of the concerns raised by this [c]ourt in denying his [original] motion." The District Court noted that Torgison had "draw[n] attention" to a new concern that his claims may be time-barred and thus had heavily argued for application of equitable tolling, but that Torgison had not demonstrated he was "actually prevented from filing on time," citing *Schoof v. Nesbit*, 2014 MT 6, ¶ 35, 373 Mont. 226, 316 P.3d 831. The District Court denied

8

the motion on the ground that Torgison had "fail[ed] to state and fully address the applicable standard governing motions pursuant to [M. R. App. P. 22(1)]," including establishing "that he is likely to succeed on the merits of his appeal."

## STANDARD OF REVIEW

¶12 "The standard of review of a grant or denial of injunctive relief is whether the court manifestly abused its discretion." *Davis v. Westphal*, 2017 MT 276, ¶ 10, 389 Mont. 251, 405 P.3d 73 (citation omitted). We have held that a manifest abuse of discretion "is one that is obvious, evident or unmistakable." *Shammel v. Canyon Res. Corp.*, 2003 MT 372, ¶ 12, 319 Mont. 132, 82 P.3d 912 (citation omitted). "If the district court's decision on a preliminary injunction was based on legal conclusions, however, we review those conclusions to determine if the court's interpretation of the law was correct." *Montanans Against Irresponsible Densification, LLC v. State*, 2024 MT 200, ¶ 8, 418 Mont. 78, 555 P.3d 759 (*MAID*) (citation omitted).

## DISCUSSION

¶13 *Whether the District Court manifestly abused its discretion by denying Torgison's motion for preliminary injunction.*

¶14 "A preliminary injunction is an extraordinary remedy never awarded as of right." *MAID*, ¶ 10 (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 376 (2008)). For a preliminary injunction to be granted, the applicant must establish four statutory requirements. Section 27-19-201(1), MCA.[3] These requirements are:

---

[3] The Montana Legislature amended § 27-19-201(1), MCA, in the 2025 regular legislative session. However, the amendments did not affect the language referenced herein.

(a) the applicant is likely to succeed on the merits;
(b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief;
(c) the balance of equities tips in the applicant's favor; and
(d) the order is in the public interest.

Section 27-19-201(1), MCA. The applicant bears the burden of establishing all four requirements. Section 27-19-201(3), MCA. "The current test is conjunctive. That is, the applicant for an injunction bears the burden of establishing the likelihood of each element. . . ." *MAID*, ¶ 12. "A preliminary injunction 'does not decide the merits of a claim . . . ; rather[,a court's decision] must remain focused on the limited purpose of a preliminary injunction—to preserve the status quo and minimize the harm pending final resolution.'" *Netzer, Krautter & Brown, P.C. v. State*, 2025 MT 249, ¶ 15, 424 Mont. 421, 578 P.3d 899 (internal citation omitted).

¶15 Before considering the District Court's ruling on the injunction standards, we address several preliminary issues Torgison raises in his arguments, including that the District Court erred by "summarily determining that all activities of the Port taken in violation of the open meeting law are moot," determining all his claims were untimely filed because "Torgison should have been more vigilant in ascertaining rumors as to the affairs of the Port," and failing to apply equitable tolling pursuant to *Schoof*.

¶16 In response, the County argues that these arguments mischaracterize the District Court's order as "finding that Torgison's claims are time-barred and moot[,]" and that Torgison cannot cite to any such ruling by the District Court, including any finding that Torgison "should have been more vigilant in ascertaining rumors as to the affairs of the Port." Rather, the County argues the District Court cited the lapse of time with regard to

the issue of whether it was likely that Torgison could succeed on his claims at a point where, subsequent to any open meeting violation, development had already occurred pursuant to contracts entered by the Port. The Port argues that Torgison has altered his case theory on appeal, contending that equitable tolling was not raised in the District Court, but rather that Torgison's position was that he had previously only heard "rumors" of contract actions taken by the Port, and actually learned of the violations after his counsel recently conducted research.

¶17    Torgison replies that he raised the issue of equitable tolling in the District Court, quoting the District Court's reference to tolling in its order denying his motion for an injunction pending appeal. However, while the District Court referenced the tolling argument Torgison made in this post-judgment motion, the issue was first raised at that time, after the District Court entered its original injunction Order following the hearing, during which the statutes of limitation, mootness, and equitable tolling were not raised. More importantly, we do not read the District Court's Order as concluding that Torgison's claims were either time-barred or moot, only that he had not established the likelihood of success on the merits, which included the District Court's assessment of the time that had passed:

> Considering the facts of this case the [c]ourt is concerned for the Plaintiff's likelihood to succeed not solely on the violation of the open meeting law, but on the ultimate request to vacate the contracts. The Plaintiff was aware of this sale for approximately 2 years and took no action with the [c]ourt. In the interim substantial clean up and development has been accomplished by a private individual, not a party to this case. This is not as straightforward as requiring an issue be revisited which has had no further involvement, as in *Bryan* [*v. Yellowstone Cnty. Elem. Sch. Dist. No. 2*, 2002 MT 264, 312 Mont. 257, 60 P.3d 381]. Rather this case is more analogous to *City of Deer Lodge*

[*v. Fox*, 2017 MT 129, 387 Mont. 478, 395 P.3d 506], but in this case the train is much father [sic] down the track than it was for the TRB office. Here substantial clean up, construction, and infrastructure has been changed.

¶18 While timeliness, mootness, and applicability of equitable tolling may yet be considered in the proceeding, these issues are not yet developed or appropriate for review in this preliminary injunction appeal. Factual determinations regarding the alleged violations of the open meeting and participation statutes, and about Torgison's knowledge and actions, have yet to be made and would be requisite for an assessment of the applicability of these doctrines. We thus leave these issues for consideration during the proceeding.

¶19 Torgison also argues that the District Court failed to consider all of the statutory injunction factors, other than likelihood of success, and erred in "deciding the ultimate issue in the case" by way of its conclusions that his claims were either mooted or futile because Torgison "could not prevail as all Port activities had been fully implemented[.]" Torgison argues that, while such conclusions may be correct "as to Noble's sale to a third party, it is most certainly not true as to all actions taken by the Port Authority in the 2 ½ years that it concealed its activities." Torgison argues he is likely to succeed because "the Port confessed to violating the open meeting law," and that the public will be irreparably harmed if the Port is allowed to implement decisions in violation of the rights to know and participate. He asks that this Court reverse the order denying the injunction, and "issue a stay as to further implementation of any actions taken by the [Port] between May, 2022 to April, 2025[.]"

¶20 The Port answers that Torgison failed to establish all four elements necessary to obtain a preliminary injunction and that the requested injunction would not "preserve the status quo, but rather would be used to change the status quo to undo years of Port Authority decisions." The Port argues that Torgison failed to establish that either he or the public generally would have any damages, much less irreparable damage, if the injunction was not granted, because "the sale to Noble was a one-time transaction completed years ago." For its part, the County contends that Torgison "has yet to identify any action taken by the County" in violation of open meeting laws, and "does not identify a single action taken by the County that he seeks to enjoin." It argues that injunctive relief is inappropriate given that Torgison has only challenged past actions, but that the District Court's order "does not preclude Torgison from any meaningful relief on his ultimate claims under the Montana Constitution and the open meeting laws."

¶21 We agree with the Defendants that the District Court did not enter a ruling on the merits of either the open meeting laws or the availability of relief. The District Court used language conveying that it was not entering a final decision, repeating that this was not a "straight forward" case, even if it was assumed that open meeting laws had been violated, but that, nonetheless, Torgison had not "satisf[ied] his burden for a preliminary injunction." The status quo of this proceeding was the status of transactions that had been completed in past years by the Port, and any continuing performance or actions taken pursuant thereto, all of which would have been disrupted by a preliminary injunction. To be sure, upon proof of a violation of open meeting and participation laws, the District Court would yet be called upon to fashion an appropriate remedy. *See, e.g., Bryan*, ¶¶ 52-54 (voiding the school

13

district's decision but "not command[ing] the District to reopen those schools it has already closed"). However, we conclude that the District Court did not manifestly abuse its discretion in denying a preliminary injunction on the basis of this record and the relief requested.

¶22    Affirmed.

/S/ JIM RICE

We Concur:

/S/ CORY J. SWANSON
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON