FILED

02/28/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0074

DA 17-0074

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 36

KEVIN NELSON,

        Petitioner and Appellant,

  v.

CITY OF BILLINGS, MONTANA, and MONTANA
MUNICIPAL INTERLOCAL AUTHORITY of
Helena, Montana,

        Respondents and Appellees.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 14-1028
Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Kevin Nelson, Self-Represented, Billings, Montana

        For Appellees:

        Harlan B. Krogh, Crist, Krogh & Nord, PLLC, Billings, Montana

Submitted on Briefs:  October 18, 2017

Decided:  February 28, 2018

Filed:

                               Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Kevin Nelson filed a Petition for Release of Documents with the Thirteenth Judicial District Court requesting "everything related to" a civil judgment the Montana Municipal Interlocal Authority[1] (MMIA) paid on behalf of the City of Billings (City). The City and MMIA released to Nelson all non-privileged documents and provided privilege logs describing those documents withheld on the ground of attorney-client or attorney-work-product privilege. The District Court granted summary judgment to the City and MMIA on the ground that Nelson had received all of the documents that he was entitled to examine. Nelson appeals, arguing that Montana's constitutional right to know forecloses the City's and MMIA's privilege claims. We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 Steven Feuerstein, a former Billings City police officer, secured a $1.6 million judgment in a 2006 civil rights lawsuit against the City. MMIA, an interlocal government agency that provides insurance coverage to the City, paid the full judgment to Feuerstein. MMIA determined, however, that the City's policy did not cover certain portions of the judgment and sought reimbursement from the City for $900,000. The City's and MMIA's reinsurer, Specialty National, declared bankruptcy and did not participate in paying the judgment.

---

[1] Nelson's Petition erroneously named MMIA as the "Montana Municipal Insurance Authority." As noted by the Respondents, the organization is properly titled the "Montana Municipal Interlocal Authority." We have amended the caption accordingly.

¶3 Sometime in 2009, the City and MMIA attempted to discuss the matter in a closed session. The *Billings Gazette* filed suit to enjoin the closed session, and a district court issued a preliminary injunction, prohibiting any non-public discussions about the matter. That case was dismissed as moot when the City and MMIA agreed not to engage in further discussions.

¶4 MMIA later filed suit in district court against the City and Specialty National for reimbursement. Nelson alleges that during the course of that litigation, the City held closed meetings—in violation of the Montana Constitution and Open Meeting laws—to discuss litigation strategy, including a work session on June 24, 2013, which Nelson had asked to attend. The City and MMIA eventually reached a settlement agreement in which the City agreed to pay MMIA $500,000 to dispose of MMIA's lawsuit.

¶5 Nelson first requested documents from MMIA relating to the Feuerstein matter in August 2013. Nelson wrote a letter asking for "all documents in the matter of City of Billings/Feuerstien [sic]." He wrote that he would "pay any reasonable copying and postage fees of not more than $50.00" for the documents. MMIA responded to Nelson's letter and informed him that MMIA's files contained privileged documents that would need to be reviewed by general counsel and redacted before the documents could be given to Nelson. MMIA explained that, given Nelson's broad request, the costs of reviewing the documents and copying them would far exceed fifty dollars. MMIA sent another letter to Nelson a few weeks later that included copies of agendas and minutes for all MMIA meetings in which the Feuerstein case was discussed. In response, Nelson requested "all communication" "in the matter of MMIA/City of Billings/Feuerstein," including all

3

correspondence between the parties and their attorneys. Nelson again stated that he would pay copying and postage fees up to fifty dollars. MMIA responded with a letter again explaining that the documents Nelson requested may be protected from disclosure by privilege and that in order to fulfill Nelson's request general counsel would need to review thousands of documents at a cost far exceeding fifty dollars "in staff time and legal bills." MMIA requested that Nelson agree to pay these costs before MMIA proceeded. MMIA never received a response from Nelson.

¶6     Nelson also requested documents from the City in August 2013. His initial request to the City was for meeting minutes and agendas from three dates, including the June 24, 2013 meeting from which he was excluded. The City provided him with minutes and agendas from two of the meetings he requested, along with minutes and agendas from two other meetings that took place around the same time. The City informed him that there were no minutes from the June 24, 2013 meeting because at that time Montana law did not require minutes to be kept for closed litigation strategy sessions. In a follow-up letter, Nelson requested "access to and copy of in the matter of MMIA/City of Billings/Feuerstein, all communication." As in his correspondence to MMIA, Nelson wrote that he would pay copying and postage fees up to fifty dollars. The City responded that some of the requested documents may be protected by privilege and that given the broad request, the cost of searching for, reviewing, and copying the documents would exceed fifty dollars. The City requested Nelson to advise it on how he wished to proceed. The City never received a response from Nelson.

¶7 On July 23, 2014, Nelson filed with the District Court a Petition for Release of Documents against MMIA and the City, asking for the release of "everything" "related to the matter of Steve Feuerstein/The City of Billings/Montana Municipal Insurance Authority." His petition also alleged that the closure of meetings during the litigation was a violation of the Montana Constitution and open meeting laws. He asked the court to compel the release of all documents, order an investigation to determine whether his constitutional rights were violated, and order other remedies. MMIA and the City provided Nelson with over seven thousand pages of documents and a privilege log detailing the documents withheld. MMIA and the City then moved for summary judgment on the basis that all non-privileged documents had been released. Nelson did not file a response or opposition to that motion, but rather filed a one-page "Motion to Deny Summary Judgment" with no supporting brief. Following a hearing, the District Court granted summary judgment in favor of MMIA and the City and dismissed the petition.

## STANDARD OF REVIEW

¶8 This Court exercises plenary review over matters of constitutional interpretation. *Cross v. VanDyke*, 2014 MT 193, ¶ 5, 375 Mont. 535, 332 P.3d 215; *Bryan v. Yellowstone Cnty. Elementary Sch. Dist. No. 2*, 2002 MT 264, ¶ 16, 312 Mont. 257, 60 P.3d 381.

## DISCUSSION

¶9 Nelson argues on appeal that Montana Constitution Article II, Section 9, protects his right to know and allows him to examine any documents of public bodies or agencies of state government with only one exception: when individual privacy clearly exceeds the merits of public disclosure. He argues that because neither the City nor MMIA can claim

5

any right to individual privacy, they cannot refuse to produce any documents to him based on the attorney-client or attorney-work-product privileges.

¶10     MMIA and the City argue that privileged documents are not subject to disclosure under the Montana Constitution because they are not "documents . . . of . . . public bodies." Therefore, they reason, Article II, Section 9, does not require the City and MMIA to make documents protected by the attorney-client or attorney-work-product privileges available for Nelson's examination. Alternatively, the City and MMIA argue that the District Court's order can be affirmed summarily because Nelson failed to respond in a procedurally proper manner to their motion for summary judgment.

¶11     We first reject the City's and MMIA's argument that the District Court's grant of summary judgment can be affirmed in a summary manner due to Nelson's procedural deficiencies. Although Nelson failed to brief the issues before the District Court on summary judgment, this failure to respond did "not relieve the District Court of the duty to engage in a Rule 56 analysis when presented with a motion for summary judgment." *Chapman v. Maxwell*, 2014 MT 35, ¶ 11, 374 Mont. 12, 322 P.3d 1029. The District Court properly held a hearing and issued a judgment considering the claims under the standards set out in M. R. Civ. P. 56. Applying de novo review, we consider Nelson's claims under the same standards.

¶12     Montana Constitution Article II, Section 9, provides: "No person shall be deprived of the right to examine documents . . . of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure." We have held that the language of Article II,

6

Section 9, is unique, clear, unambiguous, and speaks for itself without requirement for "extrinsic aids or rules of construction." *Great Falls Tribune Co. v. Great Falls Pub. Sch.*, 255 Mont. 125, 129, 841 P.2d 502, 504 (1992) (*Tribune II*); *Associated Press v. Bd. of Pub. Educ.*, 246 Mont. 386, 391-92, 804 P.2d 376, 379 (1991); *Great Falls Tribune v. Dist. Court of the Eighth Judicial Dist*, 186 Mont. 433, 437-38, 608 P.2d 116, 119 (1980) (*Tribune I*). Pursuant to the plain meaning of the language of Article II, Section 9, we have construed the term "documents . . . of . . . public bodies or agencies" to mean documents "generated or maintained" by the bodies or agencies in relation to their "function and duties." *Becky v. Butte-Silver Bow Sch. Dist. No. 1*, 274 Mont. 131, 138, 906 P.2d 193, 197 (1995).

¶13 As a right expressly enumerated in the Montana Constitution, the right to know is a fundamental right subject to the highest degree of protection. *Walker v. State*, 2003 MT 134, ¶ 74, 316 Mont. 103, 68 P.3d 872; *Butte Cmty. Union v. Lewis*, 219 Mont. 426, 430, 712 P.2d 1309, 1311 (1986). Like other constitutional rights, however, the right to know is not absolute. *See Great Falls Tribune v. Mont. Pub. Serv. Comm'n*, 2003 MT 359, ¶ 39, 319 Mont. 38, 82 P.3d 876 (*Tribune III*); *Worden v. Mont. Bd. of Pardons & Parole*, 1998 MT 168, ¶¶ 33-37, 289 Mont. 459, 962 P.2d 1157; *State ex rel. Smith v. Dist. Court of the Eighth Judicial Dist.*, 201 Mont. 376, 383, 654 P.2d 982, 986 (1982); *Tribune I*, 186 Mont. at 438-39, 608 P.2d at 119.

¶14 In construing constitutional provisions, we apply the same rules used in construing statutes. *Grossman v. Mont. Dep't of Natural Res.*, 209 Mont. 427, 451, 682 P.2d 1319, 1331 (1984). The intent of the Framers controls the Court's interpretation of a

constitutional provision. *Cross*, ¶ 10; *Butte-Silver Bow Local Gov't v. State*, 235 Mont. 398, 403, 768 P.2d 327, 330 (1989); *Keller v. Smith*, 170 Mont. 399, 405, 553 P.2d 1002, 1006 (1976). Borrowing from the rules of statutory construction, we often declare that we must discern the Framers' intent from the plain meaning of the language used and may resort to extrinsic aids only if the express language is vague or ambiguous. *See, e.g., Cross*, ¶¶ 10, 21-28; *State ex rel. Racicot v. Dist. Court of the First Judicial Dist.*, 243 Mont. 379, 386-88, 794 P.2d 1180, 1184-86 (1990); *Butte-Silver Bow Local Gov't*, 235 Mont. at 403-05, 768 P.2d at 330-31; *Keller*, 170 Mont. at 404-09, 553 P.2d at 1006-08. Even in the context of clear and unambiguous language, however, we have long held that we must determine constitutional intent not only from the plain meaning of the language used, but also in light of the historical and surrounding circumstances under which the Framers drafted the Constitution, the nature of the subject matter they faced, and the objective they sought to achieve. *Rankin v. Love*, 125 Mont. 184, 187-88, 232 P.2d 998, 1000 (1951); *State ex rel. Hamshaw v. Justice Court of Union Twp.*, 108 Mont. 12, 15, 88 P.2d 1, 2 (1939); *State ex rel. Hillis v. Sullivan*, 48 Mont. 320, 325-26, 137 P. 392, 393-94 (1913); *accord, e.g., Judicial Standards Comm'n v. Not Afraid*, 2010 MT 285, ¶¶ 17, 25, 358 Mont. 532, 245 P.3d 1116; *State v. Schneider*, 2008 MT 408, ¶¶ 15, 18, 347 Mont. 215, 197 P.3d 1020; *Tribune III*, ¶¶ 33-37; *Kottel v. State*, 2002 MT 278, ¶¶ 9, 35-39, 312 Mont. 387, 60 P.3d 403; *Mont. Envtl. Info. Ctr. v. Dep't of Envtl. Quality*, 1999 MT 248, ¶¶ 65-77, 296 Mont. 207, 988 P.2d 1236; *Becky*, 274 Mont. at 137, 906 P.2d at 196-97; *Grossman*, 209 Mont. at 433-34, 451-52, 682 P.2d at 1322-23, 1332; *Sch. Dist. No. 12 v. Hughes*, 170 Mont. 267, 272-74, 552 P.2d 328, 331 (1976); *Great N. Utils. Co. v. Pub. Serv. Comm'n*,

88 Mont. 180, 219-21, 293 P. 294, 304 (1930); *State ex rel. Rankin v. Harrington*, 68 Mont. 1, 21, 217 P. 681, 685 (1923); *Davis v. Stewart*, 54 Mont. 429, 434-37, 171 P. 281, 283-84 (1918); *State ex rel. Fenner v. Keating*, 53 Mont. 371, 378-80, 163 P. 1156, 1157-58 (1917); *State v. Keeler*, 52 Mont. 205, 216-18, 156 P. 1080, 1083 (1916); *N. Pac. Ry. v. Mjelde*, 48 Mont. 287, 296-97, 137 P. 386, 388 (1913); *State ex rel. McGowan v. Sedgwick*, 46 Mont. 187, 191-93, 127 P. 94, 96 (1912); *State ex rel. Jackson v. Kennie*, 24 Mont. 45, 56-57, 60 P. 589, 593 (1900).

¶15 "In determining the meaning of the constitution, the Court must keep in mind that it is not the beginning of law for the state, but a constitution assumes the existence of a well understood system of law which is still to remain in force and to be administered, but under constitutional limitation." *Grossman*, 209 Mont. at 451-52, 682 P.2d at 1332. The constitution refers to many terms and concepts that it does not define. *Hillis*, 48 Mont. at 326, 137 P. at 394. The Court examines these concepts in the context of "'the previous history' of this community [and] 'the well-understood system' then in use." *Hillis*, 48 Mont. at 326, 137 P. at 394. We have not considered previously whether any privileges protected by statute or common law at the time of adoption survived enactment of the 1972 Constitution. Nelson's appeal presents that question.

¶16 As with statutory interpretation, constitutional construction should not "lead to absurd results, if reasonable construction will avoid it." *Grossman*, 209 Mont. at 451, 682 P.2d at 1332. The principle of reasonable construction "allows courts to fulfill their adjudicatory mandate and preserve the [Framers'] objective." 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction*, § 45:12, 115 (7th ed. 2014) (hereafter

Singer). Thus, a fundamental rule of constitutional construction is that we must determine the meaning and intent of constitutional provisions from the plain meaning of the language used without resort to extrinsic aids except when the language is vague or ambiguous or extrinsic aids clearly manifest an intent not apparent from the express language. *See* 2A Singer, *supra*, § 46:7, 267-73 (when interpreting statutes, courts may look beyond the literal text if it is inconsistent with legislative meaning or intent); *see also Associated Press, Inc. v. Mont. Dep't of Revenue*, 2000 MT 160, ¶¶ 105-08, 300 Mont. 233, 4 P.3d 5 (Nelson, J., specially concurring).

¶17 The Framers drafted Article II, Section 9, in broad and general terms. In its report to the whole convention, the Bill of Rights Committee explained that the purpose of the provision was to "presume the openness of government documents and operations" to combat "government's sheer bigness[, which] threatens the effective exercise of citizenship." Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 631. The Bill of Rights Committee of the 1972 Constitutional Convention clearly modeled the language of Article II, Section 9, on Montana's 1963 open meeting law, which applied to "[a]ll meetings of *public or governmental bodies*, boards, bureaus, commissions [and] *agencies of the state or any political subdivision.*" *See* § 82-3402, RCM (1947) (emphasis added); 1963 Mont. Laws ch. 159, § 2; Montana Constitutional Convention, Committee Proposals, February 22, 1972, pp. 631-32; Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1669-70. The Committee intended that Article II, Section 9, would expand the availability of government documents beyond the more narrow 1895 statutory definitions of public and private writings then codified at Title 93,

chapter 1001, §§ 2-3, RCM (1947). *See* Montana Constitutional Convention, Committee Proposals, February 22, 1972, pp. 631-32; Montana Constitutional Convention, Verbatim Transcripts, March 7, 1972, p. 1670. We thus have construed Article II, Section 9, as creating "a constitutional presumption that every document within the possession of public officials is subject to inspection." *Bryan*, ¶ 39.

¶18 The Bill of Rights Committee cautioned, however, that the right to know is not absolute. Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 632 ("The committee intends by this provision that the right to know <u>not</u> be absolute."). Recognizing that they were defining a constitutional right and not drafting a statute, the Chair of the Bill of Rights Committee, Wade Joseph Dahood, explained to the other delegates that Article II, Section 9, is

> stated in a broad principle form. It's the type of constitutional right that must necessarily be expressed in general terms; the specific guidelines that perhaps some of the critics would like cannot be stated within that particular section if it's to fall within the framework of a true constitutional principle. It's a principle that must endure for the decades and the ages. . . . [T]he court shall interpret within this particular doctrine.

¶19 Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, p. 2489. Though largely focused on balancing with the individual right to privacy protected by Article II, Section 10—*see* Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 632; Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1670; Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, p. 2484—the Framers understood that the right to know would be subject to interpretation and considered together with other constitutional rights and existing laws.

11

*See* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1679 (noting that "all rights have to be balanced against a police power" in accord with "that doctrine" of the U.S. Supreme Court in response to Delegate McDonough's question as to whether Article II, Section 9, would afford criminal defendants a broader right to examine confidential criminal justice information). The Framers recognized that, like other fundamental rights protected in the federal and state constitutions, the parameters of the right to know would be interpreted over time in the context of particular factual situations.

¶20 Importantly, during debate on Article II, Section 9, the delegates acknowledged instances, unrelated to individual privacy concerns, in which the right to know would not apply: when "necessary for the integrity of government." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1678. For example, the delegates acknowledged the then-existing open meeting laws and existing exceptions to open meetings. Multiple delegates expressed the intention that Article II, Section 9, did not abrogate those laws; no delegate spoke to the opposite conclusion. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1677-78. Further, the delegates discussed multiple other instances in which they did not intend for Article II, Section 9, to change current law and practice. Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, pp. 2494-2500. Of singular import here, convention deliberations clearly indicate that the Framers did not intend for Article II, Section 9, to abolish, supersede, or alter preexisting legal privileges applicable to government proceedings and documents.

12

¶21 For example, opposing a motion to revise the language of Article II, Section 9, to allow the Legislature to define privacy exceptions to the public's right to know as advocated by press interests, the Chairman of the Bill of Rights Committee stated:

> How about the *confidential relationships* that are *set by statute* that are zealously guarded? Should they not be protected? Should not communication with respect to a private matter that deals with some governmental concern between attorney and client not be protected? Perhaps there's some disclosure between priest and penitent, doctor and patient, the sacred relationships that are so important in a free society; should they not be paramount? Should they not be supreme?

Montana Constitutional Convention, Verbatim Transcript, March 5, 1972, pp. 1673-74 (emphasis added). In response to concerns that the broad language of Article II, Section 9, would upset preexisting privileges protecting the integrity of government operations, the Chairman of the Bill of Rights Committee advised the Committee that it would not:

> DELEGATE SKARI: Mr. Dahood, in Section 82-3402, Revised Codes of Montana, in Section 4, they say that one of the exceptions is "the purchasing of public property, the investing of public funds, or other matters involving competition or bargaining which, if made public, may adversely affect the public security or financial interest of the state or any political subdivision or agency of the state." Does your Bill of Rights Section 9 cover that sort of thing? In other words, *can the state's interest be protected here?*

> DELEGATE DAHOOD: *Yes, I think the state's interest is protected* in those instances where there's a need for that protection. Where you've got a bidding situation, of course, that particular matter must be kept confidential until the bidding is over.

> \*    \*    \*

> DELEGATE SKARI: Well, as I read it, Section 9 states "except in the case where the demand of individual privacy exceeds the merits of public disclosure." I have a little trouble with that.

DELEGATE DAHOOD: Well, Delegate Skari, what we are talking about here, of course, is protecting basically the right of the individual with respect to those matters that may affect him. I think *what you're talking about is the statute that has to do with certain functions of government* in securing property for the operation of government to serve the citizen. . . . I think, as you read it, that indicated *that there must be some confidentiality up to a particular point*; is that not true?

DELEGATE SKARI: Yes.

DELEGATE DAHOOD: And I think *that's necessary for the integrity of government within that particular area*. I do not think that anyone would expect to have information before a particular point of decision is reached in that situation, because the reason for it, of course, is to secure property for the government at the best obtainable price.

DELEGATE SKARI: Thank you.

\* \* \*

DELEGATE DAVIS: Mr. Dahood, . . . *is it your intention on this to repeal* the *existing statutes* on open hearings, or do you feel that they would still remain in full force and effect?

DELEGATE DAHOOD: I feel they would still remain in full force and effect.

Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1677-78, 1680 (emphasis added).[2] Addressing similar concerns that the undefined and unqualified reference to "public bodies" in Article II, Section 9, would require deliberations of juries,

---

[2] In addition to various express exceptions involving individual privacy interests, the then-existing open meeting law also included express exceptions for: (1) "[n]ational or state security;" (2) "the purchasing of public property;" (3) "the investing of public funds or other matters involving competition or bargaining which, if made public may adversely affect the public security or financial interest of the state or any political subdivision or agency of the state;" and (4) "[l]aw enforcement, crime prevention, probation or parole." Section 82-3402, RCM (1947).

14

grand juries, and this Court to be open to the public contrary to established law, the

Chairman of the Bill of Rights Committee advised the Committee that it would not:

> DELEGATE BERG: I have been concerned as a lawyer about the use of the word "public bodies" . . . When I think of a public body deliberating, I think first of a jury . . . I think also of grand juries. . . . Those deliberations ought not to be open. . . . For that reason I think we should strike the words "bodies or," because . . . that terminology . . . is clearly broad enough to include the deliberations of a . . . jury. Similarly, . . . take the deliberations of the Supreme Court. That's a public body. Is it to be understood that Mr. Davis, or Mr. Dahood, or myself, if we're on opposite sides of the case, having finished the argument, may then go into chambers with the court and observe their deliberations in the judgment of the case we just argued? . . . Now I want to see all agencies, in particular, opened up to the public. I want their documents examined; I want their deliberations open. I am particularly interested in the operations of the city councils and boards of county commissioners, as well as all other agencies and commissions and forms of government. . . . But I do not think that the term "public bodies" adds anything, and it may create problems which we do not otherwise envisage. . . .

> \* \* \*

> DELEGATE DAHOOD: I think [Delegate Berg's] concern is one that should concern us all. And I think the interpretation that he has given could possibly be laid against this section, but . . . *I'm not satisfied in my mind and judgment that a court could conceivably give that interpretation to "bodies."* We are referring there to public bodies; perhaps city councils, perhaps some bureaucratic groups or some bureau that may have been established perhaps for some particular special public purpose that may not fall within the term of "agencies." . . . I think our comments clearly indicate that *we are not trying to upset any traditional rule of procedure with respect to anything within the judiciary. . . . I just do not think that that problem would arise.* And with those comments in the record and in the journal, I would stand with the present language.

Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, pp. 2499-500

(emphasis added).

¶22 Consistent with the Framers' manifest intent that Article II, Section 9, would not affect preexisting legal privileges against public disclosure, the 1972 Constitution included a Transition Schedule that, in pertinent part, provided:

> All laws . . . and rules of court not contrary to, or inconsistent with, the provisions of this Constitution shall remain in force, until they shall expire by their own limitation or shall be altered or repealed pursuant to this Constitution.

Mont. Const. Transition Schedule § 6. The Transition Schedule "presuppose[d] that the laws . . . in force upon the effective date of the new Constitution [were] those which [were] not contrary to or inconsistent with" the Constitution. *State ex rel. Woodahl v. Dist. Court of the Second Judicial Dist.*, 162 Mont. 283, 294, 511 P.2d 318, 324 (1973).

¶23 The attorney-client privilege has deep roots in the American legal system. *See Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 682 (1981) ("The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law."); *see also United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165, 131 S. Ct. 2313, 2318 (2011) ("The attorney-client privilege ranks among the oldest and most established evidentiary privileges known to our law."). The attorney-client privilege protects confidential communications between an attorney and client during the course of the professional relationship. Section 26-1-803, MCA; *Am. Zurich Ins. Co. v. Mont. Thirteenth Judicial Dist. Court*, 2012 MT 61, ¶ 9, 364 Mont. 299, 280 P.3d 240. The purpose of this privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy

16

depends upon the lawyer's being fully informed by the client." *State ex rel. U.S. Fid. & Guar. Co. v. Mont. Second Judicial Dist. Court*, 240 Mont. 5, 10, 783 P.2d 911, 914 (1989) (quoting *Upjohn Co.*, 449 U.S. at 389, 101 S. Ct. at 682). The privilege also serves "to ensure attorneys freely give accurate and candid advice to their clients without the fear it will later be used against the client." *Am. Zurich Ins. Co.*, ¶ 9. The privilege promotes the attorney-client relationship and the functioning of the legal system. *Am. Zurich Ins. Co.*, ¶ 24.

¶24     Likewise, the attorney-work-product privilege, although articulated as such only in the twentieth century, has a long history in this country. *See Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S. Ct. 385, 393 (1947) ("In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. . . . That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests."). This opinion work-product privilege "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *Diacon ex rel. Palmer v. Farmers Ins. Exch.*, 261 Mont. 91, 116, 861 P.2d 895, 910 (1993) (quoting *United States v. Nobles*, 422 U.S. 225, 238, 95 S. Ct. 2160, 2170 (1975)). The privilege "serves the adversarial process directly by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *Am. Zurich Ins. Co.*, ¶ 24 (internal quotation omitted). As the United States Supreme Court recognized when articulating the attorney-work-product privilege: "Were such materials open to opposing counsel on mere demand, much of what

17

is now put down in writing would remain unwritten. . . . And the interests of the clients and the cause of justice would be poorly served." *Hickman*, 329 U.S. at 511, 67 S. Ct. at 393-94.

¶25    Evidentiary privileges—like the attorney-client and attorney-work-product privileges—protect governmental agencies and employees like any other party to civil litigation to ensure "broader public interests in the observance of law and administration of justice." *See Upjohn Co.*, 449 U.S. at 389, 101 S. Ct. at 682; *Jicarilla Apache Nation*, 564 U.S. at 170, 131 S. Ct. at 2321 ("[G]overnmental agencies and employees enjoy the same privilege as nongovernmental counterparts." (quoting 1 Restatement (Third) of the Law Governing Lawyers § 74 cmt. b (1998))). Attorney-client and attorney-work-product privileges are integral to the operation of our legal system and encourage an attorney's candid advice to prevent or resolve disputes.

¶26    The inviolate nature of these privileges is a cornerstone of our judicial system, reflecting "the policy of the law to encourage confidence and to preserve it inviolate." Section 26-1-801, MCA; *see Hickman*, 329 U.S. at 511, 67 S. Ct. at 393.

¶27    What's more, both privileges were ingrained in Montana's legal landscape at the time the 1972 Montana Constitution was drafted and ratified. The attorney-client privilege was first adopted in Montana in 1867—twenty-two years before statehood. *See* 1867 Mont. Laws §§ 373-77, pp. 210-11. Montana adopted the Federal Rules of Civil Procedure in 1961, which the United States Supreme Court had interpreted fourteen years earlier to include an attorney-work-product privilege. *See* 1961 Mont. Laws ch. 13; *Hickman*, 329 U.S. at 511, 67 S. Ct. at 393.

¶28 The Constitution vests this Court with authority over procedural rules for the judicial system under Article VII, Section 2(3). Evidentiary privileges long have been protected in the Montana Rules of Civil Procedure, preventing opposing parties from discovering privileged documents during litigation. *See, e.g.*, M. R. Civ. P. 26(b)(1), (3). Such protections were in the Montana Rules of Civil Procedure both before and after the 1972 Constitution was adopted. *See* 1961 Mont. Laws ch. 13; No. AF 07-0157, Or. (Mont. April 26, 2011). It is not reasonable to conclude that the Framers intended to eliminate these privileges for public bodies in Montana without a single acknowledgment of such an intention during the convention debates. *Cf. Hillis*, 48 Mont. at 326-28, 137 P. at 394-95 (examining constitutional authority of judges and county commissioners vis-à-vis the employment of court staff in light of the laws in place and the functions of each "well known when our Constitution was adopted").

¶29 Further, the Framers validated this Court's historical authority to set procedural rules to perpetuate and maintain the legal system of this state. *See* 1959 Mont. Laws ch. 255, § 5; Mont. Const. art. VII, § 2(3). In fact, the Framers chose to strengthen this Court's role in the rulemaking process by eliminating the statutory requirement for legislative approval of court rules. But they left in place a constitutional check on judicial rulemaking: our rules are subject to *disapproval* by the Legislature within two legislative sessions of their passage. Mont. Const. art. VII, § 2(3). Importantly, the Legislature did not disapprove of court rules that retain these privileges.

¶30 Given this history, the 1972 Convention proceedings, and the Constitution's own Transition Schedule, we conclude that the Framers' intent is manifest that the preexisting

attorney-client and work-product privileges would carry forward inviolate as essential components of the preexisting legal system regardless of the broad, clear, and unambiguous language of Article II, Section 9.[3] Therefore, we hold that documents protected by the attorney-client or attorney-work-product privileges are not subject to disclosure under Article II, Section 9.

¶31 Pointedly, just as the fundamental right to know is not absolute, neither are these privileges. And just as the right to know is not a tool for private litigation interests, *see Friedel, LLC v. Lindeen*, 2017 MT 65, 387 Mont. 102, 392 P.3d 141, neither are these privileges a means for public bodies and government agencies to impede transparency. We construe the attorney-client privilege narrowly because it obstructs the truth-finding process. *Am. Zurich Ins. Co.*, ¶ 10. As such, "the [attorney-client] privilege protects only those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Am. Zurich Ins. Co.*, ¶ 10 (internal quotation omitted). Too, the attorney-work-product privilege does not grant absolute protection.[4]

---

[3] There are other instances in which the Constitution's literal language has been construed to perpetuate the common law existing at the time of adoption. For example, "although Article II, Section 26 of Montana's Constitution provides that '[t]he right of trial by jury is secured to all and shall remain inviolate,' the right to jury trial encompassed by § 26 embraces only those causes of action 'in which the right was enjoyed when the constitution was adopted.'" *State v. Chilinski*, 2016 MT 280, ¶ 8, 385 Mont. 249, 383 P.3d 236 (citations omitted).

[4] "The immunity offered by the work-product doctrine depends on the type of work product being sought." *Diacon ex rel. Palmer*, 261 Mont. at 115, 861 P.2d at 910. Ordinary work product, "which relates to factual matters," may be discoverable "to the extent that it is not privileged," *Diacon ex rel. Palmer*, 261 Mont. at 115, 861 P.2d at 910, upon showing of substantial need and inability to obtain the substantial equivalent without undue hardship, M. R. Civ. P. 26(b)(3)(A). Opinion work product, which relates to mental impressions, opinions, conclusions, or legal theories, enjoys broader protection. M. R. Civ. P. 26(b)(3)(B).

¶32    Courts assess privilege claims carefully in the context of litigation discovery disputes, and they should follow the same course when privilege is asserted in response to a right-to-know request. *See, e.g.*, *Draggin' Y Cattle Co. v. Addink*, 2013 MT 319, ¶ 50, 372 Mont. 334, 312 P.3d 451 ("For work product privilege it should be determined whether the various records were created or obtained due to the prospect of litigation or in the ordinary course of business for [the government]. For attorney-client privilege the court should determine whether the communications . . . were made for the ultimate purpose of seeking legal advice."). Because of its "presumption" of disclosure, *Bryan*, ¶ 39, Article II, Section 9, embodies the principle that "the agency would be the one which would have to prove the burden" that a privilege applies. Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, p. 2489.

¶33    It is plain, then, that in a court's review of a claimed privilege when a citizen seeks government information, it should not treat the privileges as sacrosanct. Particularly in light of the presumption of openness the Constitution endows, a reviewing court must examine whether the claimed privilege in a given document is sufficient to keep that document from public disclosure. The attorney-client privilege raises special concerns when the client is a government entity. Though the attorney-client and work-product privileges apply equally to government entities as well as private entities, *see Inter-Fluve v. Mont. Eighteenth Judicial Dist. Court*, 2005 MT 103, ¶¶ 32-34, 327 Mont. 14, 112 P.3d 258 (attorney-client privilege), we must recognize the peculiar nature of government entities vis-à-vis the privileges and the public's right to know. As a threshold matter, the attorney-client and work-product privileges belong to, and benefit, their public sector

clients, not the lawyers. *Diacon ex rel. Palmer*, 261 Mont. at 106-09, 861 P.2d at 904-06. Unlike their private adversaries, state and local government entities exist for the sole purpose of serving the public. *See* §§ 2-3-103(1) and -201, MCA. As corporate entities, state and local governments can act only through their authorized officers and agents. *Inter-Fluve*, ¶¶ 33-34. Because public officers and agents hold their positions as "a public trust, created by the confidence that the electorate reposes in [their] integrity," those officers and agents act in their official capacities solely "for the benefit of the people." Section 2-2-103(1), MCA.

¶34 Consequently, because they obstruct "the truth-finding process" and—as applied to government agencies and public bodies—collide with the public's fundamental right to know under Article II, Section 9, the attorney-client and work-product privileges must be narrowly construed to effect their limited purposes. *See Draggin' Y*, ¶ 41. The attorney-client "privilege protects only those disclosures" made by the client "to obtain informed legal advice" and the legal advice given. *Draggin' Y*, ¶ 41 (quoting *Am. Zurich Ins. Co.*, ¶ 10). For example, the California Supreme Court has held that the attorney-client privilege "is not applicable when the attorney acts merely as a negotiator for the client or is providing [non-legal] advice." *Costco Wholesale Corp. v. Super. Court of Los Angeles Cnty.*, 219 P.3d 736, 743 (Cal. 2009). That Court also has held that, except to the extent that they directly or indirectly disclose the substance of legal advice given or facts communicated by the client to the attorney for the purpose of obtaining legal advice, the attorney-client privilege does not protect attorney-client billing records. *Los Angeles Cnty. Bd. of Supervisors v. Super. Court of Los Angeles Cnty.*, 386 P.3d 773, 779-82 (Cal. 2016)

(holding that attorney-client billing records disclosing amounts billed to or spent by government on terminated litigation were not protected by the attorney-client privilege).

¶35    As with other evidentiary privileges, the attorney-client and work-product privileges must cease to exist when they no longer serve their underlying purposes. *See Herrig v. Herrig*, 199 Mont. 174, 177-81, 648 P.2d 758, 760-62 (1982) (attorney-client privilege ceases to exist after death of client where the claim of right at issue derives from the deceased and the privileged communication is probative of deceased's intent in regard thereto); *State v. Boatwright*, 401 P.3d 657, 663 (Kan. 2017) ("Attorney-client privilege . . . does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." (quoting *United States v. Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 2626 (1989)); *Costco Wholesale Corp.*, 219 P.3d at 743; *see also* § 1-3-201, MCA (common law maxim that rule should cease where its justification ends); *cf. State v. Forsythe*, 2017 MT 61, ¶¶ 15, 27, 35, 387 Mont. 62, 390 P.3d 931 (holding that spouse's threatening statements to the other were not privileged because the threats did not further the privilege's purpose of preserving the sanctity of the marriage); *State v. Nettleton*, 233 Mont. 308, 315-17, 760 P.2d 733, 738-39 (1988) (holding that spousal admission about the fact and manner of a third-party murder made for purposes of terrifying and intimidating spouses to remain silent did not further purpose of preserving the sanctity of the marriage); *In re Marriage of Sarsfield*, 206 Mont. 397, 406, 671 P.2d 595, 600-01 (1983) (holding that spousal admission about the fact of sexual abuse of couple's child did not further the purpose of preserving the sanctity of the marriage); *In re J.H.*, 196 Mont. 482, 484-87, 640

P.2d 445, 447-48 (1982) (holding that spousal admission about the fact of abuse of couple's child did not further the purpose of preserving the sanctity of the marriage).

¶36 Upon a demand for public documents under Article II, Section 9, the government entity asserting the attorney-client or work-product privilege has the burden of proving the application and the scope of the asserted privilege to the court upon *in camera* inspection.[5] *Cf. Bryan*, ¶ 39. Upon finding privileged material, the reviewing court must—as possible based on the nature and substance of the documents—give effect to both the subject privilege and the public's right to know by ordering appropriate redaction of the privileged information and disclosure of the unprivileged balance of the document, if any.

¶37 The City and MMIA produced detailed privilege logs from which the validity of their privilege claims could be evaluated. In response, Nelson simply presented a blanket challenge, insisting that no documents could be withheld on privilege grounds consistent with Article II, Section 9. The case thus does not require us to determine under what circumstances the City's and MMIA's claimed privileges could yield to the right to know, and we decline to speculate. The District Court appropriately recognized that Nelson's position that the government cannot withhold privileged documents would be "antithetical to" the public interests the privileges serve and would "render[ ] the attorney client privilege [and attorney-work-product privilege] meaningless." Nelson was free to object to MMIA's and the City's claims of privilege on the legal grounds that the privileges should

_____

[5] This *in camera* review also necessarily may involve appropriate balancing of the public's right to know against asserted or implicated rights to individual privacy or other fundamental constitutional rights in conflict with the right to know.

not apply to protect particular documents. But he did not do so. Based on the record before it, the District Court correctly determined that documents protected by the attorney-client and attorney-work-product privileges were not subject to release under Article II, Section 9, of the Montana Constitution.

**CONCLUSION**

¶38 The District Court's judgment is affirmed.

/S/ BETH BAKER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

Justice Laurie McKinnon, specially concurring.

¶39 Although I believe the Court's analysis is significantly flawed, I reach the same conclusion and therefore specially concur. The Court's reasoning contains inconsistent statements and rules of law, distorted interpretations of the 1972 Convention proceedings, and is inundated with unnecessary dicta.[1] Although the Court states that the attorney-client

---

[1] I take issue with the Court's excessive insertion of dicta. In an attempt to thwart future issues which are sure to arise from the Court's blanket exclusion of attorney-client privileged information from the public's right to know, the Court states that certain information does not fall under the privilege's protection. Opinion, ¶ 34. Specifically, the Court cites to a case from California for the proposition that the attorney-client privilege does not apply to cases where the attorney acts as a negotiator or provides non-legal advice, and thus presumably such information would be discoverable pursuant to the public's right to know. *See* Opinion, ¶ 34 (citing *Costco Wholesale*

25

privilege is not absolute, Opinion, ¶ 31, the Court confuses narrowly interpreting the privilege, Opinion, ¶ 34, with its creation of an impenetrable exception to a citizen's constitutional right to inspect documents of public bodies. Thus, regardless of the information contained within the document and the need of citizens to inspect its contents in order to effectuate the right to know and monitor a particular activity of their government, the documents are automatically beyond the purview of a court and citizens whenever the document is created out of the government's relationship with its counsel.[2] An impenetrable judicially created exception to the public's constitutional right to know is not only unsupported by our precedent and Montana's Constitution, but is an unwise impediment to a citizen's ability to monitor the functioning of its government.[3] The interests of the government in protecting the confidentiality of particular documents and the constitutional presumption of a citizen's right to inspect those documents should be

_Corp._, 219 P.3d at 743). The Court also cites to another California case holding that the attorney-client privilege does not protect an attorney's billing records except to the extent that the records "disclose the substance of legal advice given or facts communicated by the client to the attorney for the purpose of obtaining legal advice." Opinion, ¶ 34 (citing _Los Angeles Cnty. Bd. of Supervisors_, 386 P.3d at 779-82). Such matters are not at issue in the current case and do not ultimately support the Court's decision to remove all attorney-client privileged documents from scrutiny under Article II, Section 9.

[2] The Court's explanation that the privilege will not "impede transparency" is itself a misnomer. Opinion, ¶ 31. Pursuant to the Court's analysis, a privileged document is automatically protected from disclosure, _regardless of its content_. It would appear that maintaining confidentiality of a document without regard for its contents actually _does_ "impede transparency."

[3] In these proceedings, Nelson appears as a self-represented litigant and did not have counsel before the District Court or on appeal. This Court has not had the benefit of well-developed arguments on appeal, except those made by counsel for MMIA and the City. In my opinion, the Court should not decide an issue of constitutional magnitude such as this one without having the benefit of counsel experienced in this particular area of law. I am sure that, upon invitation by the Court, any number of attorneys with an interest in constitutional litigation of this sort would have offered assistance to the Court in developing the arguments and issues.

balanced by a court; a court is both neutral and in the best position to consider the circumstances of any particular case and claim.

¶40　This Court has long recognized that the right to know is not absolute and must be balanced against other constitutional interests. I would not jettison decades of precedent, as the Court implicitly does, to reach a distorted conclusion that documents prepared by a public entity in relation to its business of governance are not presumptively "documents of public bodies." Opinion, ¶ 30. Despite this Court's apparent desire to simplify right-to-know disputes by placing governance and litigation upon which it becomes embroiled beyond public examination, it is the job of the courts to protect constitutional rights as they are expressly written and to consider them in the context of other weighty and compelling interests. Indeed, balancing of competing interests by the third branch of government, a court, was envisioned by the Delegates, not just within the parameters of Article II, Section 9, itself, but as a mechanism to consider the constitutional provision within the circumstances of a particular case. Our courts routinely balance these interests and have well-developed precedent to guide them. Nonetheless, the Court, for the first time in our history interpreting this constitutional provision, applies a statutory privilege available generally to any litigant to keep public documents confidential. The Court does so without proper regard for the constitutional right to know or adequate consideration that the litigant here is not just any litigant, but a *public* body.

¶41　It is my opinion that the Court errs, first, by concluding that documents created out of the government's relationship with counsel are *not* documents of public bodies subject to disclosure under Article II, Section 9. Opinion, ¶ 30. Second, the Court errs when it

unconditionally subjugates an express constitutional right to a statutory privilege, thus excepting from judicial scrutiny any consideration of the public's right to know and monitor a particular activity of governance. Opinion, ¶¶ 30-31, 36. Finally, the Court's analysis categorically adopts general principles of a statutory privilege to circumscribe a constitutional right—without regard to the public nature of the client. The Court's "back door" approach of defining a constitutional right by a statutory privilege is unsound and compromises fundamental principles underlying the right to know. Such an approach will prove difficult when citizens have a need, for example, to learn of government practices that can only be ascertained by examining documents created in the context of the government's relationship with counsel. Under the Court's approach, the statutory privilege takes priority over the constitutional right, thus directing the inquiry and precluding any judicial review of the public's constitutional right to know the contents of the documents.

¶42 The starting point for any right-to-know analysis is the constitutional provision itself. The Montana Constitution, Article II, Section 9, provides:

> No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

There is no dispute that MMIA and the City are government entities subject to the disclosure requirements of Article II, Section 9. Further, this Court has recognized that the Delegates' adoption of Article II, Section 9, created a "constitutional presumption that every document within the possession of public officials is subject to inspection." *Bryan*,

28

¶ 39. If the issue could be resolved completely within the confines of Article II, Section 9, then Nelson would be entitled to the documents in MMIA and the City's possession because the privacy protection included in the latter section of Article II, Section 9, does not pertain to non-human entities, such as MMIA and the City. *See Tribune III*, ¶ 36-37. However, Nelson's claim made pursuant to his presumptive right to inspect the documents is only the starting point for the inquiry. The analysis must thereafter consider the government's potentially countervailing confidentiality privileges, which are substantial and exist outside the parameters of Article II, Section 9.

¶43 However, the Court completely excludes the documents from disclosure under Article II, Section 9, by finding that documents protected by the attorney-client and attorney-work-product privileges are not documents of public bodies. Opinion, ¶ 30. To support its finding that the privileged documents are not subject to Article II, Section 9, scrutiny, the Court considers the historical roots of the privileges, the 1972 Convention proceedings, and the Constitution's Transition Schedule. Opinion, ¶ 30. While recognizing that Article II, Section 9, contains "broad, clear, and unambiguous language" requiring disclosure of all public documents, the Court maintains that the privileges were "essential components" of the legal system prior to 1972 and thus privileged documents are not subject to disclosure under Article II, Section 9. Opinion, ¶ 30. I disagree with the Court's reasoning that privileged documents are not documents of public bodies due, almost exclusively, to the fact that the privileges predated the 1972 Constitution.

¶44 I take particular issue with the way in which the Court relies upon portions of the Constitutional Convention Transcripts. The Court first recognizes, based on the

29

Transcripts, that "the Framers understood that the right to know would be subject to interpretation and considered together with other constitutional rights and existing laws" and that "like other fundamental rights protected in the federal and state constitutions, the parameters of the right to know would be interpreted over time in the context of particular factual situations." Opinion, ¶ 19. I agree that the right to know is subject to our interpretation and should be *considered together* with other constitutional rights and existing laws. Further, I see this case as an opportunity to consider how the right to know may limit certain evidentiary privileges. However, the Court completely removes documents protected by the attorney-work-product and attorney-client privileges from constitutional scrutiny under Article II, Section 9, based, in large part, upon the Delegates' purported intent as ascertained from the Constitutional Convention Transcripts.

¶45 I find the Court's analysis of the Transcripts inconsistent with the context of the Delegates' discussions. For example, in Opinion, ¶¶ 20-21, the Court extensively quotes and cites from the Delegates' discussion on March 7, 1972, Verbatim Transcript pages 1673-78, in support of its conclusion that the Delegates did not intend for the right to know to affect the existing privileges. However, that debate was solely focused on whether the right to know should contain an explicit exception for cases in which the demands of individual privacy exceeded the merits of public disclosure. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1672. Some Delegates were concerned that the individual privacy exception was too subjective and that public bodies would be able to cover up "vital public matters" by hiding information within the exception. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972,

p. 1672. Proponents of the exception went on to explain that the exception was necessary because certain documents, such as an individual's welfare application containing personal and sensitive information, should not be available for public inspection. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1673.

¶46 It was within that conversation, focused on the right to know's exception for individual privacy, that the Chairman of the Bill of Rights Committee stated that confidential relationships set by statute should be "zealously guarded." Opinion, ¶ 21 (quoting Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1673-74). The Charmain opined that the attorney-client relationship should protect communication between attorney and client "with respect to a private matter that deals with some governmental concern." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1673. The Chairman was not contemplating a situation where the government is the client and commenting on whether the right to know applies to that attorney-client relationship; instead, he was commenting on instances in which the demand of an individual's privacy, which is undisputedly not at issue here, may exceed the merits of public disclosure.

¶47 Similarly, the Court's quoted material regarding protecting the integrity of government operations, Opinion, ¶ 21, was also pulled from the Delegates' debate over the individual privacy exception. *See* Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1677-78. Further, that conversation was focused on open meetings and the Delegates were specifically discussing whether the right to know would alter or limit existing statutes as they relate to open meetings. Montana Constitutional

Convention, Verbatim Transcript, March 7, 1972, p. 1677. The Court's conclusion that the Delegates intended all statutes to remain in full effect, despite the new right to know provision, is inconsistent with the Delegates' actual conversation, which was simply a discussion regarding different Delegates' opinions on how the right to know, as drafted with an exception for individual privacy, would limit or otherwise affect existing open meeting laws.

¶48    Further, the Court cites the Transcript pages 2494-2500 for the proposition that "the delegates discussed multiple other instances in which they did not intend for Article II, Section 9, to change current law and practice." Opinion, ¶ 20. However, during those debates, the Delegates were considering whether the right to know's exception for individual privacy should be amended to add language that "*the Legislature, subject to court interpretation, shall have determined that* the demands of individual privacy exceed the merits of public disclosure." Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, pp. 2484-99 (emphasis added). Thus, that conversation was, again, focused on the individual privacy exception to the right to know. One Delegate also proposed amending Section 9 to rephrase "public bodies or agencies" to "public agencies," based on concerns for individual privacy. Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, pp. 2499-2500 (focusing, still, on the privacy exception, as evidenced by Delegate Berg stating, "I would call your attention to the last portion which reads that: 'unless the demands of individual privacy clearly exceed the merits of public disclosure.'"). The amendment ultimately failed, but it was sought to clarify that certain deliberations, including those of juries, grand juries, and the Supreme Court, were not

32

subject to public viewing under the right to know. Montana Constitutional Convention, Verbatim Transcript, March 16, 1972, p. 2501. The Court inappropriately takes bits-and-pieces of specific Delegates' opinions, as stated during Convention debate, and asserts those opinions as the intent of all of the Delegates. In doing so, the Court takes the Delegates' statements out of the contexts in which they were made.

¶49 The Court states that it "is not reasonable to conclude that the Framers intended to eliminate these privileges for public bodies in Montana," Opinion, ¶ 28, and I agree that the privileges, as applied to public bodies, surely survived enactment of the 1972 Constitution. In my opinion, however, the Court's decision today neglects the fact that the 1972 Constitution contains a right-to-know provision requiring disclosure of documents of public bodies. The Bill of Rights Committee presented the right to know to the rest of the Convention as creating a general constitutional presumption that government documents and operations would be open to the public. Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 631. The Committee intended the provision to be "a long step forward" in assuring government openness to increase the public's confidence in government operations. Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 632. The Court's decision goes against the Committee's stated interests by completely excluding privileged documents of public bodies from Article II, Section 9, scrutiny. As the Court recognizes, "a constitution assumes the existence of a well understood system of law which is still to remain in force and to be administered, *but under constitutional limitation*." Opinion, ¶ 15 (quoting *Grossman*, 209 Mont. at 451-52, 682 P.2d at 1332) (emphasis added). The Court further relies on the

33

Constitution's Transition Schedule, which states, in part, that laws and rules in existence prior to the Constitution's enactment "remain in force, *until they . . . shall be altered or repealed pursuant to this Constitution*." Opinion, ¶ 22 (quoting Mont. Const. Transition Schedule § 6(1)) (emphasis added). Accordingly, while I agree that enactment of the right-to-know provision in 1972 did not eliminate public bodies' privileges, I believe that we must determine whether documents protected by the privileges are subject to Article II, Section 9, scrutiny, and, if subject to the right to know, how the privileges are now limited or altered by the constitutional right.

¶50　Nonetheless, the Court, once again, distorts precedent by relying on *Chilinski* for the proposition that a privilege existing at common law may withstand the clear and express language of a subsequently adopted constitutional provision. Opinion, ¶ 30. In *Chilinski*, this Court recognized that the right to a jury trial was adopted as part of the 1889 Constitution and was recodified in the 1972 Constitution. Based upon recodification of the right, this Court held that a jury trial was guaranteed in the class of cases where the right was enjoyed when the constitution was adopted in 1889. The 1972 constitutional provision for a jury trial did not alter, repeal, or limit the 1889 constitutional provision; rather it adopted in full force the provision as it existed in 1889. *Chilinski*, ¶¶ 8-9. In contrast, here, the express language of Article II, Section 9, which was *new* to the 1972 Constitution, constitutionally limits any preexisting rules and laws inconsistent with the right to know. It requires, as the Delegates envisioned, that a *court* would balance the competing interests of a particular case in order to determine whether documents of a public entity should be disclosed.

34

¶51 I find it necessary to distinguish the attorney-client privilege from the attorney-work-product privilege before analyzing how the right to know applies in these proceedings. Both privileges generally protect a client's interest in effective legal representation—an interest that is essential in our adversarial system of justice. The United States Supreme Court, as well as this Court, consistently protect this interest. *See Hickman*, 329 U.S. at 510-11, 67 S. Ct. at 393, and other authority cited by this Court in Opinion, ¶¶ 23-26. While neither privilege is memorialized as a constitutional right, the privileges have deep historical roots and are fundamental to our legal profession and the administration of justice. Opinion, ¶¶ 23-24, 27.

¶52 Although fulfilling the same general purpose of ensuring clients receive adequate legal representation, the two privileges have different specific purposes and ultimately protect different information. *Am. Zurich Ins. Co.*, ¶ 24. The attorney-work-product privilege protects an attorney's mental processes. Opinion, ¶ 24 (citing *Palmer*, 261 Mont. at 116, 861 P.2d at 910). The privilege "serves the adversarial process directly" by permitting attorneys the freedom to prepare their cases assured that their work product will not be used against their clients. *Am. Zurich Ins. Co.*, ¶ 24. Specifically, the attorney-work-product privilege protects "documents and tangible things that are prepared in anticipation of litigation or for trial" unless those materials are "otherwise discoverable under [M. R. Civ. P.] 26(b)(1)" or if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." M. R. Civ. P. 26(b)(3)(A)(i)-(ii). Thus, a party cannot hide relevant facts by asserting attorney-work-product privilege, because parties may access

information within the privilege that is not otherwise discoverable. The attorney-work-product privilege is unique, as an attorney must be able to "assemble information, sift what he considers to be the relevant from the irrelevant facts, [and] prepare his legal theories and plan his strategy without undue and needless interference" in order to adequately represent his client. *Hickman*, 329 U.S. at 511, 67 S. Ct. at 393.

¶53    The attorney-work-product privilege is focused on the documents an attorney herself produces as she represents a client. The work-product is particular to that attorney and is privileged from disclosure to protect the client's interests. An attorney, in working through a case, creates her own documents, makes her own notations, and organizes her own files in a particular manner consistent with her strategies specific to that case. The work-product is not a document of a public body, as the attorney, not the client, created the work-product. Accordingly, the attorney's work-product cannot be subject to disclosure under the right to know, as the work-product is not a document of a public body or agency. Thus, I agree with the Court that documents appropriately protected under the attorney-work-product privilege are not documents of public bodies subject to disclosure under Article II, Section 9. Opinion, ¶ 30. If the documents are not documents of public bodies, then Article II, Section 9, is not applicable and Nelson has no constitutional right to know their contents. Because attorney-work-product is not subject to disclosure under Article II, Section 9, no further constitutional analysis is needed, as the right to know does not apply to documents that are not those of public bodies.

¶54    I disagree, however, with the Court's conclusion that documents protected under the attorney-client privilege are not documents of public bodies and therefore never subject to

disclosure under Article II, Section 9. Opinion, ¶ 30. The attorney-client privilege protects "any communication made by the client to the attorney or the advice given to the client in the course of professional employment." Section 26-1-803(1), MCA. The attorney-client privilege promotes and protects the attorney-client relationship by encouraging clients to fully inform their attorneys and encouraging attorneys to provide candid legal advice to their clients. *Am. Zurich Ins. Co.*, ¶¶ 9, 24. The privilege is necessarily narrow, protecting only "disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." Opinion, ¶ 31 (quoting *Am. Zurich Ins. Co.*, ¶ 10). Documents relating to such communications and advice are protected under the attorney-client privilege, but also may be considered "documents of public bodies" when the client is a public body, based on the "constitutional presumption that every document within the possession of public officials is subject to inspection." *Bryan*, ¶ 39.

¶55     I do not believe, however, that the documents, as documents of public bodies, are always discoverable pursuant to Article II, Section 9, as Nelson contends. As the Court recognizes, the right to know is not absolute. Opinion, ¶ 13. Article II, Section 9, does not unequivocally require disclosure of public documents where the sought-after information is elsewhere protected from disclosure by statute or the federal or state constitutions. *Tribune III*, ¶ 39. While there exists a "constitutional presumption that all documents of every kind in the hands of public officials are amenable to inspection, regardless of legislation, special exceptions [are] made to accommodate the exercise of constitutional police power and other competing constitutional interests, such as due process."

37

*Associated Press, Inc.*, ¶ 85 (Nelson, J., specially concurring) (quoting *Belth v. Bennett*, 227 Mont. 341, 344, 740 P.2d 638, 640 (1987)).

¶56     In my opinion, the right to know is a fundamental constitutional right that may sometimes demand public disclosure of attorney-client privileged documents. Instead of recognizing that the attorney-client privilege may now be limited by the right to know, the Court completely excludes the privileged, public documents from Article II, Section 9, scrutiny. Opinion, ¶ 30. The Court's blanket exclusion of all privileged documents from Article II, Section 9, analysis is unwarranted, as there are some instances where the merits of public disclosure may indeed exceed the asserted privilege. To use a current national event as an example, it was recently revealed that Stormy Daniels (Stephanie Clifford) was paid $130,000 in the fall of 2016 to keep quiet about an alleged on-again, off-again affair between herself and Donald Trump.[4] Daniels received the payment from a shell company in Delaware; a company set up by Trump's lawyer, Michael Cohen, for the sole purpose of passing the payment to Daniels. Cohen, in a recent statement, indicated that he used personal funds to *facilitate* the payment, but it is still unclear who actually paid Daniels the $130,000. It is also unclear whether and to what extent Trump himself was personally involved in any negotiation discussion or payment. Because Cohen is Trump's attorney, the attorney-client privilege likely protects most of the information regarding Trump's potential involvement. Under the Court's decision, if a similar matter was at issue in Montana, the public would be excluded from requesting any information regarding the

---

[4] Paul Waldman, *Trump's lawyer just made the Stormy Daniels affair much more interesting*, The Washington Post (February 14, 2018), https://perma.cc/HW6N-SJBF.

monetary exchange pursuant to Article II, Section 9, if the information is protected by the attorney-client privilege. However, it is my view that the public should be able to utilize its right to know and ask for privileged information if the public's interest in the information is sufficiently weighty or compelling. Accordingly, in situations where attorney-client privileged documents are requested pursuant to Article II, Section 9, I believe the appropriate approach is to balance the public's right to know with the weighty and compelling attorney-client privilege to determine whether, in that case, the merits of public disclosure exceed the privilege's protections.

¶57 Such an analysis is consistent with our Article II, Section 9, precedent. Significant to our discussion here, the right to know "can be properly circumscribed when the right or interest against which it competes is weighty or compelling." *Smith*, 201 Mont. at 383, 654 P.2d at 986. For example, in *Tribune I* we recognized that the public's right to know was not absolute and that a defendant's constitutional rights to a fair and speedy trial must be balanced against the public's right to know. We observed that a "balancing of these competing rights is required." *Tribune I*, 186 Mont. at 438-39, 608 P.2d at 119. In *Tribune III*, we observed that a power company may assert a claim of confidentiality if the documents in question constituted a property right which was protected under constitutional due process requirements. *Tribune III*, ¶ 39. We remanded for a hearing to consider "all of the circumstances" and whether the property right asserted was a "trade secret" warranting due process protections. *Tribune III*, ¶ 62.

¶58 Similarly, in *Smith*, we balanced the defendant's right to a fair and impartial trial against the public's constitutional right to know. We emphasized that the public's right

was not absolute and noted that it can be properly circumscribed when the competing right or interest is "weighty or compelling." *Smith*, 201 Mont. at 383, 654 P.2d at 986. We considered the competing rights and decided that the public may be excluded from an otherwise public hearing "only if dissemination of information acquired at the hearing would create a clear and present danger to the fairness of defendant's trial and no reasonable alternative means can be utilized to avoid the prejudicial effect of such information." *Smith*, 201 Mont. at 385, 654 P.2d at 987. Accordingly, *Smith* and *Tribune I* and *III* establish that the public's right to know under Article II, Section 9, must be balanced with other rights and interests. Those other rights and interests, however, must be weighty or compelling enough to justify nondisclosure of otherwise public information.

¶59 In determining whether a right or interest is weighty or compelling enough to overcome the public's right to know, we must balance various factors while looking at the totality of the circumstances. The relevant factors to balance will depend on the specifics of each case. In the same way we balance "the competing constitutional interests in the context of the facts of each case, to determine whether the demands of individual privacy clearly exceed the merits of public disclosure," *Associated Press, Inc.*, ¶ 24 (internal quotations, citations, and emphasis omitted), we should also balance other competing interests to determine whether, based on the facts of each case, a right or interest is weighty or compelling enough to exceed the merits of public disclosure. For example, in *Associated Press, Inc.*, the Court considered factors such as "the type of taxpayer involved . . . , the source of the information provided by the taxpayer, and the public's interest in the

40

information" to determine "whether a taxpayer's right of privacy outweighs the public's right to know." *Associated Press, Inc.*, ¶ 27.

¶60 Likewise, in *Worden*, we balanced an inmate's right of privacy in his parole file with the public's right to know. *Worden*, ¶ 21. We held that "each document in an Inmate's file must be examined to determine whether all or part of it is subject to the privacy exception of the right to know." *Worden*, ¶ 29. We acknowledged the fluidity and case-specific nature of such an inquiry, pointing out that "an Inmate has a strong privacy interest in his or her own parole file," and that a third person's request to examine the file requires a different analysis than the inmate's request to examine his own file. *Worden*, ¶ 30. Thus, we decided that we must determine, on a case-by-case basis, whether an inmate or a third party has a privacy interest in each "document that outweighs the requesting party's right to know." *Worden*, ¶ 30. In the same way, we should require a case-specific balancing of the right to know with the other rights or interests being asserted to determine whether a right or interest is weighty or compelling enough to exceed the merits of public disclosure.

¶61 In these proceedings, I would clarify that documents appropriately protected by the attorney-work-product privilege are not documents of public bodies and thus not subject to Article II, Section 9, analysis. I would then reaffirm that the right to know, like all constitutional rights, is not absolute, as there could be instances where the public has the right to know information which is also protected by the statutory attorney-client privilege. Under such circumstances, the statutory privilege should not automatically preclude a court's consideration of a litigant's constitutional right to know. Rather, as our

well-established jurisprudence recognizes, we should balance the statutory attorney-client privilege asserted by MMIA and the City to determine whether the privilege constitutes an interest weighty or compelling enough to overcome the constitutional presumption of the public's right to inspect the documents. Here, Nelson presented a blanket challenge to MMIA and the City's claims of privilege.[5] Based on the record, I would affirm the District Court's determination that the documents are protected by the attorney-work-product and attorney-client privileges. I would further hold that any documents covered only by the attorney-client privilege were properly withheld by MMIA and the City because, in this case, the parties' interest in protecting the documents under the attorney-client privilege is weighty and compelling enough to exceed the merits of public disclosure.

¶62 Accordingly, I disagree with the Court's analysis and maintain that it is unsound and unsupported by the Montana Constitution and this Court's precedent. However, I agree that Nelson's blanket challenge to MMIA and the City's claim of privilege is insufficient to compel disclosure of the documents.

`                                          /S/ LAURIE McKINNON

---

[5] Again, I regret that the Court has made a decision of such constitutional magnitude based upon this record, after a blanket challenge to an asserted statutory privilege, and without the benefit of counsel advocating adversarial positions.